973 A.2d 365

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
OSCAR OSORIO, DEFENDANT–RESPONDENT.

Argued April 27, 2009—Decided July 2, 2009.

*Barbara A. Rosenkrans,* Assistant Prosecutor, argued the cause for appellant (*Paula T. Dow,* Essex County Prosecutor, attorney).

*Diane M. Toscano,* Assistant Deputy Public Defender, argued the cause for respondent (*Yvonne Smith Segars,* Public Defender, attorney).

*Leslie–Ann M. Justus,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Anne Milgram,* Attorney General, attorney).

*Alison S. Perrone* argued the cause for *amici curiae* American Civil Liberties Union of New Jersey and Association of Criminal Defense Lawyers of New Jersey (*Ms. Perrone,* attorney; *Ms. Perrone, Edward L. Barocas, Jeanne M. Locicero, Nadia N. Seeratan,* and *John C. Whipple,* on the brief).

Justice RIVERA–SOTO delivered the opinion of the Court.

One of our most cherished rights is the right to trial by a fair and impartial jury. We zealously guard that right by, among other things, requiring that the jury selection process be free of racial or ethnic taint. When it has been discerned that impermissible bias has infected the selection of a jury, we have not hesitated to excise that cancer and require a new trial, one where prejudice and hatred have no place.

 We refine slightly the methodology to be applied in gauging bias claims in the jury selection process, reaffirming that a three-step process must be employed whenever it has been asserted that a party has exercised peremptory challenges based on race or ethnicity. Step one requires that, as a threshold matter, the party contesting the exercise of a peremptory challenge must make a prima facie showing that the peremptory challenge was exercised on the basis of race or ethnicity. That burden is slight, as the challenger need only tender sufficient proofs to raise an inference of discrimination. If that burden is met, step two is triggered, and the burden then shifts to the party exercising the peremptory challenge to prove a race- or ethnicity-neutral basis supporting the peremptory challenge. In gauging whether the party exercising the peremptory challenge has acted constitutionally, the trial court must ascertain whether that party has presented a reasoned, neutral basis for the challenge or if the explanations tendered are pretext. Once that analysis is completed, the third step is triggered, requiring that the trial court weigh the proofs adduced in step one against those presented in step two and determine whether, by a preponderance of the evidence, the party contesting the exercise of a peremptory challenge has

proven that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias.

## I.

In 2001, defendant Oscar Osorio and a minor were observed by the police as they engaged in illicit drug transactions outside an abandoned house in Newark. Defendant and his juvenile accomplice were arrested, and defendant was charged with various drug offenses. During jury selection at defendant's April 2002 trial, the prosecutor used her first six peremptory challenges—striking jurors numbers four, eight, nine, ten, twelve and fourteen—to strike four African–American jurors and two Hispanic jurors. Those actions gave rise to the following objection from defense counsel at sidebar:

[DEFENSE COUNSEL]: Judge, I'm always hesitant to bring up this subject, but so far the Prosecutor has exercised four [peremptory challenges] against African Americans and two against Hispanic females. My client is a Hispanic male. I'd ask that this panel be discharged, and we start the process over. My client has a right to be judged by his peers and not to have certain groups of people excluded.

THE COURT: I understand your request, and [defense counsel] is accurate in his description of the race and nationality of the individuals [the prosecutor] did excuse, but as we were going through it I, generally, without making complete notes, could see for the most part that there were other reasons in which those individuals could have been excused—whatever the motives are. I think because of that, that I'm going to deny your request. I will, however, in light of the prima facie evidence, give the appropriate caution to the State in that regard, and to indicate to you, [prosecutor], that your subsequent—don't feel you have to use all of them, but any subsequent challenges will be potentially scrutinized more seriously in that regard. Suffice it to say, that's my instruction.

[THE PROSECUTOR]: Yes, Judge.

The effect of the trial court's caution was short-lived: the prosecutor used her very next peremptory challenge to strike yet another African–American juror. That precipitated yet another request by defense counsel for a sidebar conference. Once there, defense counsel did not have to state his obvious basis for his objection; without input from defense counsel, the following exchange between the trial court and the State ensued:

THE COURT: Okay. As I said I would, can you give us your reasons?

[THE PROSECUTOR]: Judge, as I indicated—I will indicate for the record that I observed juror number 11 sleeping for the majority of the selection; not that he needs to be attentive, but it was my opinion that that would be indicative of his attention level and credibility as a juror on the trial.

THE COURT: I'm satisfied.

[DEFENSE COUNSEL]: He realizes he can nap now, and there's not much going on now.

Defendant was convicted of second-degree conspiracy to violate the narcotics laws, in violation of *N.J.S.A.* 2C:5–2; third-degree possession of cocaine, in violation of *N.J.S.A.* 2C:35–10(a)(1); third-degree possession of cocaine with the intent to distribute, in violation of *N.J.S.A.* 2C:35–5 (a)(1) and (b)(3); third-degree possession of cocaine within 1000 feet of school property with the intent to distribute, in violation of *N.J.S.A.* 2C:35–7; second-degree possession of cocaine within 500 feet of a public housing facility with the intent to distribute, in violation of *N.J.S.A.* 2C:35–7.1; and second-degree employing a juvenile in a drug distribution scheme, in violation of *N.J.S.A.* 2C:35–6. He was sentenced to an aggregate term of imprisonment of seven years, subject to an aggregate five-year period of parole ineligibility; fees, penalties and assessments, as required, also were imposed. Defendant appealed and, in an unpublished opinion, the Appellate Division affirmed his convictions and sentence, but remanded "the case to the trial court for the prosecutor to justify the use of her peremptory challenges."

Focusing on the first exchange concerning the State's exercise of peremptory challenges, the panel explained that "the trial court violated the principles set forth in *Gilmore*[1] and *Watkins*[2] by failing to require the prosecutor to come forward with evidence that the use of her first six peremptory challenges to excuse minority jurors was justifiable on the basis of concerns about situation-specific bias." It noted that "[a]lthough the court did not discuss the factors set forth in *Watkins*, it found that the prosecu-

---

[1] *State v. Gilmore*, 103 *N.J.* 508, 511 *A.*2d 1150 (1986).

[2] *State v. Watkins*, 114 *N.J.* 259, 553 *A.*2d 1344 (1989).

tor's use of her first six challenges to excuse minority jurors constituted 'prima facie evidence' that the prosecutor had used those challenges in a discriminatory manner[,]" concluding that "this finding is adequately supported by the record." The panel reasoned that, once that prima facie finding had been made, "the trial court should have called upon the prosecutor to provide 'situation-specific' reasons for the exercise of her peremptory challenges." It held that if, on remand, the State satisfied its burden of demonstrating that its exercise of the contested peremptory challenges "was justifiable on the basis of concerns about situation-specific bias, the court must then determine whether defendant 'has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias.'" (quoting *Gilmore, supra*, 103 *N.J.* at 539, 511 *A.2d* 1150).

At the remand hearing conducted more than three years after the questioned jury selection, the trial court succinctly described the purpose assigned to it by the Appellate Division: "for the [p]rosecutor to justify the use of her peremptory challenges." Using her notes, the prosecutor explained that she had struck the first six jurors for the following reasons:

*Juror Number 4*, an African–American male, was excused because his brother had been arrested for narcotics.

*Juror Number 8*, an African–American female from Newark, who had been the victim of a car theft, whose father also had been the victim of a car theft, and who had both a friend and a close relative in law enforcement, was excused because her brother had been convicted of a crime and had been incarcerated for two years in a State prison.

*Juror Number 9*, from Newark, and *Juror Number 10*, from East Orange, both Hispanic females seated next to each other, were excused because they were "giggling [and] high[-]fiving when a juror in the back row was excused" and were "making faces[.]"

*Juror Number 12*, an African–American woman from East Orange, who had two relatives in law enforcement, was excused because the person or persons responsible for her father's murder "got off."

*Juror Number 14*, an African–American male also from East Orange, was excused because he was sleeping and not paying attention during jury selection.

Stating that "those are the State's reasons for the first six exclusions[,]" the State concluded that "although ... they are four black people and two Hispanic people, ... the State submits that we have noted our non-race[ ] specific non-discriminatory exclusions[.]"

Although the trial court had not retained its own trial notes and had no separate recollection of the jury selection process in this case, and without hearing from defendant's trial counsel who had objected to the State's peremptory challenges in the first instance,[3] the trial court accepted without qualification the State's explanations. It found that "the [p]rosecutor has in fact come forward with evidence that the use of her peremptory challenges were justifiable on the basis of concerns about situation specific bias." It therefore "conclude[d] that the defendant has not carried the burden of proving by a preponderance of the evidence that the [p]rosecution exercised its peremptory challenges [on the] unconstitutionally impermissible grounds of presumed group bias" and ruled that "the defendant's claim of discriminatory use of peremptory challenge is once again rejected."

In a belated offer of contrasting proofs from defendant's trial counsel concerning the State's peremptory challenges, defendant moved to supplement the record at the remand hearing and for reconsideration. Defendant, now again represented by his trial counsel, focused on the two Hispanic females who were excused allegedly "because they high-fived each other when one of the other jurors was excluded, and that they were making faces." Asserting that the behavior claimed by the State did not conform to his recollection, defendant's trial counsel stated that he "remember[ed] those two people very well." He explained that he "was very keenly aware of those two people because ... after those two women were excluded there were no Hispanics on the jury." He expanded on that point, noting that "[c]learly my client

---

[3] Defendant was represented at the remand hearing by an attorney other than the lawyer who had represented defendant at trial. No explanation was tendered on the record for what later proved to be a temporary switch in counsel.

is a[ ] Hispanic and, you know, during the jury selection I was acutely aware of the fact that he was not going to have anybody that was Hispanic that was going to sit on his jury." He explained further:

> When these two people were knocked off I was dumbfounded. I couldn't believe that these two people were taken off because they had an opportunity to answer all the questions that [t]he Court had presented to them and they did not indicate anything that would otherwise show that they couldn't be fair and impartial. And when I heard that allegedly they high-fived each other, Judge, that would have been something that would have stood out in my mind forever as far as trying cases. And I've tried a few but I've never sat in a case where I saw two jurors high-five each other during a jury selection where another juror got knocked off.
>
> I just remember these two people in particular. I thought they were excellent jurors. And, frankly, I didn't think they really favored one side or the other. . . . . I raised the issue because to me there was only one reason why they were knocked off and that's because they were both Hispanics. Probably the fear was that if Hispanics sat on a case with [defendant] that somehow they would be sympathetic and they would [acquit] him.

Addressing the difficulty of trying to conduct the remand hearing more than three years after jury selection had occurred, defendant's trial counsel pointed out that he could not "put the genie back in the bottle or, as they say, put Humpty–Dumpty back together." He asserted that the reasons for the State's peremptory challenges "should have been discussed three years ago when it occurred." He mourned that the trial court's "recollection would have been better of what was occurring in that jury panel, my recollection would have been better, and we could have hashed it out right there." He remarked that "[w]e could have even interviewed the jurors and ask[ed] them if they high-fived each other, or if other jurors had made those observations." Lamenting the limitations imposed on all by the passage of time, defendant's trial counsel asked that the trial court reconsider its ruling. The trial court rejected that plea, finding that "the defendant has not carried his burden of proving by a preponderance of the evidence that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds and, therefore, pursuant to the decision of the Appellate Division the defendant's convictions are once again affirmed[.]"

Defendant appealed and, in a published opinion, the Appellate Division reversed defendant's convictions and remanded the case for a new trial. *State v. Osorio*, 402 *N.J.Super.* 93, 952 *A.*2d 1112 (App.Div.2008). After canvassing the law in this area, and accounting for an intervening decision of the Supreme Court of the United States concerning a defendant's prima facie burden of showing that a peremptory challenge was exercised for impermissibly discriminatory reasons, *Johnson v. California*, 545 *U.S.* 162, 125 *S.Ct.* 2410, 162 *L.Ed.*2d 129 (2005), the panel concluded that the trial court had "failed to consider whether the assistant prosecutor extended even-handed consideration to the circumstance that a relative had been a crime victim—the purported reason for excusing [Juror Number 12]—to non-minority jurors." *Osorio, supra,* 402 *N.J.Super.* at 107, 952 *A.*2d 1112. It further stated that "[i]t was also incumbent upon the trial judge to consider the overall pattern of the assistant prosecutor's exercise of her peremptory challenges." *Id.* at 108, 952 *A.*2d 1112 (citation omitted). The panel also found fault with "the trial judge['s] fail[ure] to consider the composition of the jury that was ultimately selected to try defendant." *Ibid.*

The Appellate Division hesitatingly concluded that "[t]he deficiencies in the evidentiary record and the trial judge's findings on remand could support a second remand." *Id.* at 109, 952 *A.*2d 1112. The panel elected to forego that option and, instead, reversed and remanded the case for a new trial because

> more than six years have elapsed since defendant's trial, and there is no reason to believe that additional evidence material to the issue of the assistant prosecutor's exercise of her peremptory challenges could be presented on a further remand. Moreover, based on the assistant prosecutor's overall pattern of the use of her peremptory challenges, her questionable challenges of prospective [Jurors Numbers 9, 10 and 12], and her failure to apply the purported reason for the excusal of [Juror Number 12] even-handedly, we conclude that defendant made a sufficient showing that the State used its peremptory challenges in a discriminatory manner. [*Ibid.*]

The State filed a petition for certification, which was granted. *State v. Osorio*, 197 *N.J.* 13, 960 *A.*2d 743 (2008). We also granted leave to appear as amicus curiae to the Attorney General of New

Jersey, and jointly to the American Civil Liberties Union of New Jersey (ACLU–NJ) and the Association of Criminal Defense Lawyers of New Jersey (ACDL–NJ). For the reasons that follow, we affirm the judgment of the Appellate Division.

## II.

The State argues that "[t]he Appellate Division in effect overrules well-established case law that demands that deference be afforded a trial court's ruling that a prosecutor permissibly exercised peremptory challenges and recognizes the gut reaction challenge." It asserts that "[a]n attorney [may] exercise discretionary challenges to jurors based on his or her perceptions of a particular juror" and "[s]o long as the attorney could, in response to an objection, demonstrate an objective basis for the challenge, the challenge survived." It suggests strongly that "[t]he Appellate Division's ruling in effect turns ... peremptory challenges into challenges for cause."

Amicus the Attorney General of New Jersey urges that substantial deference is due to the trial court's findings, as it—and not an appellate court—had the opportunity to observe and assess the jurors and the prosecutor. She asserts that the trial court's findings were supported in the record. She also claims that the Appellate Division overstepped its role when it independently judged the record on appeal, and hence overlooked the requirement that it is the trial court that is charged to "judge the defendant's *prima facie* case against the prosecution's rebuttal to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." *Gilmore, supra*, 103 *N.J.* at 539, 511 *A.*2d 1150.

Defendant argues that the Appellate Division's decision is correct; that it is in accord with precedent; that it does not convert peremptory challenges into challenges for cause; and that it afforded all deference that was due to the trial court. Defendant's

arguments are repeated and reinforced by amici the ACLU–NJ and the ACDL–NJ.

## III.

### A.

In *Gilmore, supra,* this Court first addressed the then-recently decided *Batson v. Kentucky,* 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986), where, under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the Supreme Court of the United States held that a prosecutor is forbidden "from exercising peremptory challenges to remove jurors on the basis of their race, and that a defendant may make a *prima facie* showing of purposeful racial discrimination in the selection of the jury by relying solely on the facts concerning his or her particular case." 103 *N.J.* at 521–22, 511 *A.*2d 1150. Basing its reasoning instead "on the New Jersey Constitution, which protects fundamental rights independently of the United States Constitution[,]" *ibid.,* and "refer[ring] to federal constitutional law only as establishing the floor of minimum constitutional protection[,]" *id.* at 523–24, 511 *A.*2d 1150, the Court in *Gilmore* observed that the

> right [secured by the interplay of Article I, paragraphs 5, 9 and 10 of the New Jersey Constitution, *N.J. Const.* art. I, ¶¶ 5, 9 and 10] to trial by an impartial jury hence entails not a requirement that petit juries actually chosen must be an exact microcosm of the community, but rather the guarantee that the State's use of peremptory challenges may not restrict unreasonably the possibility that the petit jury will comprise a representative-cross section of the community.
>
> [*Id.* at 529, 511 *A.*2d 1150 (citation and internal quotation marks omitted).]

The Court then focused on the task of "formulat[ing] the procedures to be followed by trial courts when a defendant alleges that a prosecutor is improperly using peremptory challenges." *Id.* at 533, 511 *A.*2d 1150. In doing so, the Court "adapt[ed] to this context (rather than directly adopting) the burden-of-proof rules fashioned in 'disparate treatment' cases brought under Title VII of the Civil Rights Act of 1964, 42 *U.S.C.A.* §§ 2000e to 2000e–17." *Id.* at 533–34, 511 *A.*2d 1150 (citing *McDonnell Douglas Corp. v.*

*Green,* 411 *U.S.* 792, 93 *S.Ct.* 1817, 36 *L.Ed.*2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 *U.S.* 248, 101 *S.Ct.* 1089, 67 *L.Ed.*2d 207 (1981)).

The Court first fashioned a gatekeeper requirement. It "emphasize[d] that the defendant must timely object to the prosecution's use of peremptory challenges—during or at the end of the jury selection, but before the petit jury is sworn[,]" explaining that "[t]his requirement will facilitate the development of as complete a record of the circumstances as is feasible, as well as enabling the trial court to make a fairer determination." *Id.* at 535, 511 *A.*2d 1150. It also required that any objection to the exercise of a peremptory challenge is subject to "the rebuttable presumption that the prosecution has exercised its peremptory challenges on grounds permissible under Article I, paragraphs 5, 9, and 10 of the New Jersey Constitution." *Ibid.*

### B.

Against that backdrop, and drawn exclusively from the provisions of the New Jersey Constitution, the Court fashioned a three-step test. Because the starting point had been defined in terms of a rebuttable presumption in favor of the prosecution, the Court in *Gilmore* explained that, as the first step, "[t]his presumption may be rebutted … upon a defendant's *prima facie* showing that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds." *Ibid.* It instructed that, "[t]o make out such a case, the defendant initially must establish that the potential jurors wholly or disproportionally excluded were members of a cognizable group within the meaning of the representative cross-section rule." *Id.* at 535–36, 511 *A.*2d 1150 (footnote omitted).[4] As part of this first step, *Gilmore* requires that "[t]he

---

[4] *Gilmore* defines the "representative cross-section rule" in the context of the jury trial right, explaining that the "right to trial by an impartial jury, in our heterogeneous society where a defendant's 'peers' include members of many diverse groups, entails the right to trial by a jury drawn from a representative cross-section of the community." *Gilmore, supra,* 103 *N.J.* at 524, 511 *A.*2d 1150

defendant then must show that there is a substantial likelihood that the peremptory challenges resulting in the exclusion were based on assumptions about group bias [5] rather than any indication of situation-specific bias." *Id.* at 536, 511 *A.*2d 1150.

The standard established by *Gilmore*—that the presumption in favor of the constitutionality of a peremptory challenge can only be rebutted if it is demonstrated that there is a "substantial likelihood" that a peremptory challenge was based on a constitutionally infirm basis—requires updating. *Johnson, supra,* decided nineteen years after *Gilmore,* clarified and moderated that standard. 545 *U.S.* at 170–72, 125 *S.Ct.* at 2417–18, 162 *L.Ed.*2d at 139–40. *Johnson, supra,* explained that rebutting the presumption of constitutionality of a peremptory challenge was not

> intend[ed] ... to be so onerous that a defendant would have to persuade the judge—on the basis of all of the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination.
>
> [*Id.* at 170, 125 *S.Ct.* at 2417, 162 *L.Ed.*2d at 139.]

*Johnson* makes clear that the burden to overcome the presumption of constitutionality of a peremptory challenge exercise is far less exacting than was originally stated in *Gilmore.* It refined that burden thusly: "a defendant satisfies the requirements of [the] first step by producing evidence sufficient to draw an inference that discrimination has occurred." *Ibid.* In the exercise of our obligations under the New Jersey Constitution, we import the *Johnson* modification into the standard applicable to the first step of the *Gilmore* test.

We do so because our earlier standard was based on the reasoning in *Wheeler, supra,* that the party contesting the exercise

---

(citing *People v. Wheeler,* 22 *Cal.*3d 258, 148 *Cal.Rptr.* 890, 583 *P.*2d 748, 755 (1978)).

[5] *Gilmore* defines "group bias" as those instances " 'when a party presumes that certain jurors are biased merely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds[.]' " *Id.* at 531, 511 *A.*2d 1150 (quoting *Wheeler,* 148 *Cal.Rptr.* 890, 583 *P.*2d at 761).

of a peremptory challenge, "from all the circumstances of the case[,] must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." 148 *Cal.Rptr.* 890, 583 *P.*2d at 764. That standard was also described as requiring "not merely 'some evidence' permitting the inference, but 'strong evidence' that makes discriminatory intent more likely than not if the challenges are not explained." *People v. Johnson,* 30 *Cal.*4th 1302, 1 *Cal. Rptr.*3d 1, 71 *P.*3d 270, 278 (2003), *rev'd,* 545 *U.S.* 162, 125 *S.Ct.* 2410, 162 *L.Ed.*2d 129 (2005). Yet, the "more likely than not" standard on which *Gilmore* is premised is the very standard the Supreme Court of the United States condemned as being "at odds with the prima facie inquiry mandated by *Batson.*" *Johnson, supra,* 545 *U.S.* at 173, 125 *S.Ct.* at 2419, 162 *L.Ed.*2d at 141. In the final analysis, however, we adopt *Johnson's* modification of the burden of proof applicable to the first step of the *Gilmore* analysis because it is tethered to our State Constitution, which mandates that, "[i]n all criminal prosecutions the accused shall have the right to a speedy and public trial by *an impartial jury* [.]" *N.J. Const.* art. I, ¶ 10 (emphasis supplied).

As now modified, that standard can be satisfied in various ways. *Gilmore* identifies several factors available to meet that burden, such as whether " 'his opponent has struck most or all of the members of the identified group from the venire[;]' " whether the opponent " 'has used a disproportionate number of his peremptories against the group[;]' " whether " 'the jurors in question share only this one characteristic—their membership in the group—and that in all other respects they are as heterogeneous as the community as a whole[;]' " whether the opponent failed " 'to engage these same jurors in more than desultory voir dire, or indeed to ask them any questions at all [;]' " and although " 'the defendant need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule[,]' " whether " 'he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining

jurors belong[.]'" *Gilmore, supra,* 103 *N.J.* at 536, 511 *A.*2d 1150 (quoting *Wheeler, supra,* 148 *Cal.Rptr.* 890, 583 *P.*2d at 764). These factors later were collected and restated in *Watkins, supra,* 114 *N.J.* at 266, 553 *A.*2d 1344 (explaining that *Gilmore* "suggested that trial courts consider the following factors: (1) that the prosecutor struck most or all of the members of the identified group from the venire; (2) that the prosecutor used a disproportionate number of his or her peremptories against the group; (3) that the prosecutor failed to ask or propose questions to the challenged jurors; (4) that other than their race, the challenged jurors are as heterogeneous as the community as a whole; and (5) that the challenged jurors, unlike the victims, are the same race as defendant").

## C.

If a party contesting the exercise of a peremptory challenge satisfies its initial burden and, hence, rebuts the presumption of constitutionality, the second step of the *Gilmore* analysis is triggered. As *Gilmore* makes clear, "[i]f the trial court finds that the defendant has established a *prima facie* case, this in effect gives rise to a presumption of unconstitutional action that it is the burden of the [party exercising the peremptory challenge] to rebut." *Gilmore, supra,* 103 *N.J.* at 537, 511 *A.*2d 1150 (citations omitted). It explains that "[t]he burden shifts to the [party exercising the peremptory challenge] to come forward with evidence that the peremptory challenges under review are justifiable on the basis of concerns about situation-specific bias." *Ibid.* It notes that "[t]o carry this burden, the [party exercising the peremptory challenge] must articulate clear and reasonably specific explanations of its legitimate reasons for exercising each of the peremptory challenges." *Ibid.* (citations and internal quotation marks omitted). In gauging whether the party exercising the peremptory challenge has met its burden, the trial court must engage in a balancing process: it must determine whether the proffered explanations are "genuine and reasonable grounds for

believing that potential jurors might have situation-specific biases that would make excusing them reasonable and desirable, given the aim of empanelling a fair and impartial petit jury, or, on the other hand, 'sham excuses belatedly contrived to avoid admitting acts of group discrimination.' " *Id.* at 537–38, 511 *A.*2d 1150 (quoting *Wheeler, supra,* 148 *Cal.Rptr.* 890, 583 *P.*2d at 765).

The proffered explanations are not to be judged in a vacuum. *Gilmore* underscores that the "justifications of [contested] peremptory challenges need not rise to the level justifying challenges for cause." *Id.* at 538, 511 *A.*2d 1150. Thus, " 'to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias[.]' " *Ibid.* (quoting *Wheeler, supra,* 148 *Cal.Rptr.* 890, 583 *P.*2d at 765 (editing marks and alterations omitted)). We caution that "[p]ermitting such questioning of the use of peremptory challenges does not destroy the 'hunch' challenge[ as t]here is nothing ineffable or inscrutable about sound 'hunches.' " *Ibid.* That said, "[i]n deciding whether the [proponent of the contested peremptory challenge] has rebutted the inference, the trial court must be sensitive to the possibility that 'hunches,' 'gut reactions,' and 'seat of the pants instincts' may be colloquial euphemisms for the very prejudice that constitutes impermissible presumed group bias or invidious discrimination." *Id.* at 539, 511 *A.*2d 1150.

### D.

Once the party contesting the exercise of a peremptory challenge has rebutted its attendant presumption of constitutionality by producing evidence sufficient to draw an inference that discrimination has occurred (step one), and the party defending the exercise of the contested peremptory challenge has proffered explanations that the contested peremptory challenge was exercised in response to situation-specific bias and not group bias (step two), the third step of the *Gilmore* analysis becomes opera-

tive. In that third step, "the trial court must judge the [contestant]'s *prima facie* case against the [proponent]'s rebuttal to determine whether the [contestant] has carried the ultimate burden of proving, by a preponderance of the evidence, that the [proponent] exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." *Ibid.* The considerations relevant to this final step of the Gilmore analysis were comprehensively summarized in *State v. Clark,* 316 *N.J.Super.* 462, 720 *A.*2d 632 (App.Div.1998), *appeal after remand,* 324 *N.J.Super.* 558, 737 *A.*2d 172 (App.Div.1999), *certif. denied,* 163 *N.J.* 10, 746 *A.*2d 456 (2000). We cannot improve on that summary, so we adopt it at length as follows:

[O]nce a [party contesting a peremptory challenge] has made a prima facie showing of discriminatory use of peremptory challenges, the trial court must make specific findings with respect to the ... proffered reasons for exercising any disputed challenges. The court must consider whether those reasons are reasonably relevant to the particular case on trial or its parties or witnesses. Moreover, it is essential that separate findings be made with respect to each disputed challenge.

If the court finds that the [party exercising the peremptory challenge] has presented neutral reasons for exercising each disputed challenge, it must then determine whether the [contestant] has carried the ultimate burden of proving, by a preponderance of the evidence, that the [party exercising the peremptory challenge] exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias. In making this determination, the court must consider whether the [the party exercising the peremptory challenge] has applied the proffered reasons for the exercise of the disputed challenges even-handedly to all prospective jurors. A nondiscriminatory reason for exercising a peremptory challenge which appears genuine and reasonable on its face may become suspect if the only prospective jurors with that characteristic who the [party exercising the peremptory challenge] has excused are members of a cognizable group.

In addition, the court must consider the overall pattern of the [party exercising the peremptory challenge]'s use of its peremptory challenges. Even if the reasons for each individual challenge appear sufficient when considered in isolation from the ... other challenges, the use of a disproportionate number of peremptory challenges to remove members of a cognizable group may warrant a finding that those reasons are not genuine and reasonable.

Finally, the court must consider the composition of the jury ultimately selected to try the case. Although the presence on the jury of some members of the group alleged to have been improperly excluded does not relieve the trial court of the responsibility to ascertain if any prospective juror was peremptorily challenged on a discriminatory basis, this circumstance may be highly probative of the ultimate question whether the ... proffered nondiscriminatory reasons for exercising peremptory challenges are genuine and reasonable.

[*Id.* at 473–74, 720 A.2d 632 (citations and internal quotation marks omitted).]

### E.

Having examined at length the analytical paradigm applicable to contests of peremptory challenges based on group bias discrimination, and bearing in mind the modification effected to step one of the *Gilmore* framework by *Johnson, supra,* we turn to the application of that framework to the challenge lodged here.

### IV.

Defendant is a Hispanic male. At his trial, each and every one of the prosecution's first six peremptory strikes were of members of a minority group: four African–Americans and two Hispanics. When defendant's counsel objected, the trial court did not engage in the three-step analysis *Gilmore* mandates. Although it recognized the obvious implications of the prosecution's actions and concluded that defendant in fact had made out a prima facie showing that the prosecution's peremptory strikes were race- or ethnicity-based, the trial court did not then shift the burden to the State to proffer bias-neutral reasons for its peremptory challenges. Instead, the trial court commented that it believed it could discern race-neutral reasons for the challenges, albeit without explaining on the record the basis for that belief. However well-intentioned that response might have been, the immediate and lasting result was that the framework *Gilmore* carefully constructed was not applied, and the State was not required to spread on the record its non-discriminatory reasons for the peremptory challenges it exercised.

That effort did not occur until three years later, after the Appellate Division remanded the case for a *Gilmore* hearing. At that remand, the State proffered a series of reasons for its jury challenges. Regrettably, the passage of time rendered that remand hearing largely meaningless. Instead of addressing a jury challenge on the spot, where a contemporaneous record based on fresh recollections could be made and when the jurors remained

available for individual voir dire, the trial court on remand was confronted with disparate, imperfect or incomplete recollections offered by the parties and no clear recollection of its own to consider in reaching its conclusions.

The Appellate Division carefully reviewed the jury selection proceedings before the trial court, and set forth its conclusions as to the deficiencies in the jury selection process, both during trial and at the remand hearing. We agree with those findings and, in light of the fundamental constitutional considerations at issue, we too are compelled to conclude that, in the circumstances presented, the remand hearing was nothing more than the quintessential "too little, too late." Given the extreme facts of this case, once defendant objected to the State's first six peremptory challenges, a clear pattern of group bias was presented, certainly more than sufficient to "draw an inference that discrimination has occurred[,]" *Johnson, supra,* 545 *U.S.* at 170, 125 *S.Ct.* at 2417, 162 *L.Ed.*2d at 139, thus rebutting the initial presumption of constitutionality attendant to peremptory challenges. At that point, it behooved both the State and the trial court to make a contemporaneous record of the whys and wherefores on which the State's peremptory challenges were based. It was then that the trial court could have determined best whether the explanations tendered by the State were credible or a pretext. It was then that the trial court could have determined, in a complete and informed manner, whether, by a preponderance of the evidence, defendant had established that the contested peremptory challenges had been exercised on "constitutionally-impermissible grounds of presumed group bias." *Gilmore, supra,* 103 *N.J.* at 535, 511 *A.*2d 1150.

On the record before us, we refrain from holding whether the State's peremptory challenges in fact were impermissibly grounded on group bias or were properly the subject of situation-specific biases. Our hesitation in doing so is based on the absence of many of the factors critical to a reasoned review: a credible factual record; a close and timely examination of the reasons

proffered for the challenges; a careful weighing of whether the reasons proffered for the challenges were applied even-handedly to all prospective jurors; a consideration of the overall pattern of use of peremptory challenges; or a description of the composition of the venire or of the jury ultimately empanelled to hear the case. Coupled with the passage of more than seven years since jury selection, the effect of that delay on the recollection of the participants, and the incompleteness of the record resulting therefrom, the absence of a searching judicial review of those factors forecloses the meaningful examination of any contest of the State's exercise of peremptory challenges in this case. In those circumstances, and given the precious constitutional rights at stake, we eschew any intermediate measures. In the end, because the scant record before us does not instill confidence that the trial court properly exercised its discretion in assessing the propriety of the contested peremptory challenges, we are left with no reasonable or significant alternative to the remedy aptly ordered by the Appellate Division: vacating defendant's convictions and remanding the case for a new trial.

## V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.