NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1375-11T4
            A-2154-11T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

SALADIN THOMPSON,

    Defendant-Appellant.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **September 5, 2014** |
| **APPELLATE DIVISION** |

Submitted November 14, 2013 — Decided  September 5, 2014

Before  Judges  Sapp-Peterson,  Lihotz  and Maven.

On  appeal  from  the  Superior  Court  of  New Jersey, Law Division, Essex County, Docket No. 06-01-0162.

Joseph E. Krakora, Public Defender, attorney for appellant (Steven M. Gilson, Designated Counsel, on the brief).

Carolyn  A.  Murray,  Acting  Essex  County Prosecutor, attorney for respondent (Sara A. Friedman, Special Deputy Attorney General/ Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

SAPP-PETERSON, P.J.A.D.

In  these  matters,  calendared  back-to-back  as  ordered  by this court on August 8, 2012 and consolidated for purposes of

opinion, defendant appeals from the May 13, 2011 ruling in which the court found the State "did not engage in impermissible discrimination in exercising its peremptory challenges."[1] The determination was rendered following a remand proceeding ordered by this court. Defendant also appeals from the sentence imposed following the remand hearing and from the September 30, 2011 order denying his petition for post-conviction relief (PCR).

Following our review, we are unable to determine from the record of the remand proceeding whether the State's exercise of seven of its nine peremptory challenges to excuse African-Americans was the product of impermissible discrimination as opposed to situation-specific bias because the court failed to engage in the requisite "third-step" analysis established in State v. Gilmore, 103 N.J. 508, 538 (1986). We conclude the record of the remand hearing was too deficient to enable meaningful appellate review and a further remand would serve no useful purpose. Further, in light of this determination, we deem it unnecessary to consider defendant's challenge to the

---

[1] The court entered one order, the September 30, 2011 order, which it characterized as being "opened to the [c]ourt by way of Remand from the Appellate Division from a denial of his petition for Post-Conviction Relief[.]" The remand from the Appellate Division, however, was unrelated to defendant's PCR petition. The appendix does not include a separate order from the May 13, 2011 remand hearing beyond the amended judgment of conviction.

sentence imposed on remand and his PCR petition. Accordingly, we vacate the judgment of conviction and remand for a new trial.

I.

The salient facts pertinent to this appeal are taken from our previously unpublished opinion in State v. Thompson, No. A-5366-06 (App. Div. March 25, 2010) (Thompson I):

> Defendant's convictions arose out of events unfolding during the late evening of July 8, 2005. The evidence before the jury disclosed that Andrews was on the porch of 265 21st Street in Irvington at 10:30 p.m. when two African-American males arrived. One of the males was tall with a "big automatic gun, and the other was short with a "small revolver." Andrews heard four or five shots and then realized that he had been shot. The shorter man approached him and attempted to shoot him in the face, but shot the cap on his head instead. After his assailants left, Andrews heard more shooting further down the street.
>
> Officers LaCosta and Love were dispatched to a shots-fired call at Andrews' location just after 10:30 p.m. They found Andrews lying down in the hallway, bleeding from the right shoulder. Once an ambulance transported Andrews away from the scene, Officer LaCosta secured the crime scene and found four forty-caliber shell casings.
>
> Not far from the scene of Andrews' shooting that evening, in the 300 block of 21st Street, Zhou and a female employee were working at the Lily Chinese Restaurant located at 353 21st Street. Green, who was a regular customer, entered the restaurant around 10:30 p.m. and ordered food. Zhou testified that he was not that busy and recalls observing two men arrive shortly

after Green, with one of the men entering the restaurant briefly to purchase cigarettes while the other waited outside the front door.

As the customer who purchased cigarettes was leaving the restaurant, Zhou noticed him drawing his gun. Once outside, this customer began firing his gun. The male who had accompanied him to the restaurant but remained outside also started to fire shots from a gun. Zhou heard four gunshots and realized that he had been shot in the leg. He also saw bloodstains on the floor of the restaurant. Green had hurriedly left the restaurant. Later, police recovered blood evidence and bullets, as well as spent shell casings outside of the restaurant. They also photographed the wall damaged from bullet strikes inside of the restaurant.

After Zhou was treated for his leg injury, he was eventually taken to the police station, where police showed him a twelve-person photo array. Zhou identified defendant as one of the shooters. Zhou testified that he was ninety-percent certain that he had correctly identified the person in the photograph as the shooter who had remained outside, although he acknowledged that in his grand jury testimony, he had testified that he was unable to see the male who had remained outside "very good."

Defendant was apprehended later that evening following a car pursuit and foot pursuit. As defendant was fleeing from police, one officer observed defendant throw a gun that he had been carrying during the flight. Police recovered the weapon, and at trial a ballistics expert testified that all the bullets and casings the officers retrieved from the scenes of both shootings had been fired from the weapon police recovered from underneath the dumpster.

4

> Green died from his bullet wounds four days after the shootings.
>
> [*Id.* at slip op. 2-5.]

The jury convicted defendant of first-degree conspiracy to murder, N.J.S.A. 2C:5-2 and 2C:11-3(a); first-degree attempted murder, N.J.S.A. 2C:5-1 and 2C:11-3(a); first-degree conspiracy to murder, N.J.S.A. 2C:5-2 and 2C:11-3; first-degree murder, N.J.S.A. 2C:11-3(a)(1) and (2); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); simple assault, N.J.S.A. 2C:12-1(a)(1); and fourth-degree resisting arrest, N.J.S.A. 2C:29-(a)(2). At sentencing, the court imposed an aggregate sixty-seven-year custodial sentence.

Defendant appealed his conviction, raising the following issues for our consideration: the court failed to engage in the three-step analysis mandated in Gilmore, 103 N.J. at 535-38, notwithstanding that the prosecution exercised seven of its nine peremptory challenges to exclude African-American jurors (Point I); the court erred in its jury instruction on identification (Point II); and the court subjected him to disparate treatment when it imposed a custodial sentence greater than the sentences received by his co-defendant (Point III). Thompson I, supra, slip op. at 5-6.

In that prior decision, we found no merit to defendant's Point II. As to Point I, we agreed that defendant had established that a cognizable class of prospective jurors had been excused and remanded the matter

> to afford the prosecution the opportunity to articulate its reasons for excusing the seven African-American prospective jurors and for the court to then weigh those reasons against defendant's prima facie case in order to determine whether defendant has met his ultimate burden of proving by the preponderance of the evidence that the prosecution engaged in impermissible discrimination in exercising its peremptory challenges.

> [Thompson I, supra, slip op. at 15-16.]

Finally, as to Point III, we agreed the court failed to articulate any applicable aggravating and mitigating factors prior to imposing defendant's sentence, which we found required a remand to address that issue as well, if defendant's conviction otherwise stood. The Supreme Court denied defendant's petition for certification. State v. Thompson, 203 N.J. 439 (2010).

In January 2011, prior to the remand hearing, defendant filed a pro se PCR petition. The PCR petition was not adjudicated until September 2011, several months following completion of the remand proceedings.

On May 13, 2011, the court conducted the remand hearing. Defendant was represented by new counsel because his former trial counsel was practicing law in Colorado. Because defense counsel was new to the case, had only the trial transcripts of the jury selection, and because the trial had taken place three years earlier, defense counsel requested copies of the prosecutor's notes made contemporaneously at trial with the prosecutor's exercise of the State's peremptory challenges. In support of this request, defense counsel relied upon State v. Osorio, 199 N.J. 486 (2009). The State objected, arguing that Osorio does not support the proposition that the notes were discoverable and maintaining that the notes were privileged attorney work product. The court offered to turn over its notes, which it indicated were limited, for the most part, to gender and race, but disagreed that Osorio mandates that a prosecutor's notes taken during jury selection be turned over where there is a challenge to the prosecution's exercise of peremptory challenges. The court agreed the notes were attorney work product and denied the application.

The prosecutor at the remand hearing, who was the same prosecutor who tried the case against defendant on behalf of the State, then proceeded to provide the court with explanations for the State's exercise of peremptory challenges to excuse seven

prospective African-American jurors.  She first addressed the peremptory excusal of Juror B.[2]  Although the prosecutor did not explain why she excused this juror, she represented that Juror B initially asked to be excused from the jury because of her probationary work status and had expressed concern that serving on the jury may affect her employment.  The juror also indicated that she was familiar with the address where the crime occurred.  The juror further indicated she had a family member accused of drug possession.  Finally, Juror B stated she had been dissatisfied with the prosecution in a prior case in which a member of her family had been killed.

Next, the prosecutor stated she excused Juror G because the juror indicated her boyfriend, who is also the father of her child, had been convicted of a weapons offense and was currently on probation.  Although the juror expressed that she believed the outcome was fair, the prosecutor told the court she excused Juror G because the boyfriend's prosecution was undertaken by the same office now prosecuting defendant, the Essex County Prosecutor's Office.

The next juror, Juror Gr, stated she had been the victim of domestic violence, which had been prosecuted by the Essex County

---

[2]  To protect the privacy of the jurors at issue, we utilize initials.

Prosecutor's Office and ultimately dismissed. She also reported that, as part of her personal life, she hosted what she referred to as "passion parties," where she presented "adult" items. The prosecutor stated "the aggregate effect of those statements on [Juror Gr's] part cause[d] me to have a reaction that she would not be a juror who would be equally open to the State's evidence in this murder case." As such, that juror was excused.

The prosecutor discussed the exercise of the State's peremptory challenge to excuse Juror H, whose brother had been convicted of murdering his wife. Although subpoenaed as a witness, the juror did not testify in that trial. In light of the juror's brother's status and the juror's close connection to a homicide as a subpoenaed witness, the prosecutor did not "think that [the juror] would be an appropriate juror able to be single-mindedly focused on the evidence in this case."

As for Juror Go, the prosecutor explained the State elected to excuse him because he had been prosecuted in connection with a case where his son was reportedly the victim. Juror Go indicated the case was "'thrown out.'" Because he had been accused and prosecuted by the Essex County Prosecutor's Office, the prosecutor believed he too would be unable to "focus his attention single-mindedly on the facts that would be before this jury."

Juror Mk expressed that she was very religious, read daily meditations and indicated that it was very important for her to make meetings. The prosecutor explained to the court that she did not know the significance of the meetings and, therefore, attempted follow-up questioning, which the court denied. In view of the very religious nature of her answers, the prosecutor expressed that the "State chose to peremptorily excuse her from the case because we felt that she might, in fact, be disturbed in sitting in judgment upon another individual, particularly in something as serious as a murder case."

Finally, the prosecutor explained that the State used a peremptory challenge to excuse Juror Jn. During the voir dire, Juror Jn stated that neither he nor any member of his family had ever been charged with an offense. The prosecutor, however, was aware that Juror Jn was a defendant in a matter pending in Essex County. The prosecutor expressed that she believed Juror Jn's response was deliberately misleading. She therefore decided to peremptorily excuse him.

The prosecutor concluded her presentation by noting that the "final composition of the jury included five African-American jurors and nine who were not African-American," but whom the prosecutor believed could be visually identified as "white individuals, Asian or Hispanic." In response to the

prosecutor's presentation, defense counsel agreed that "much of the information that the Prosecutor has indicated today is, of course, and naturally available on . . . the transcript of the jury selection." Nonetheless, he maintained that without the prosecutor's notes, to which the prosecutor made reference — at least three times — in giving her explanations, he was at a disadvantage because he had "no means whatsoever of rebutting or responding to what she said."

The trial court denied defense counsel's renewed application for the prosecutor's notes for the reasons previously expressed, namely, the notes were subject to the work product privilege. The court then found defendant failed to meet his ultimate burden of establishing impermissible discrimination in the jury selection, because the defense had no other evidence to present to the court beyond "the use of seven -- almost 80% of the challenges against African Americans." The court credited the explanations provided by the prosecutor and found no basis to set aside defendant's conviction and to order a new trial.

After reaching this decision, the court then proceeded to address the separate point of our remand to articulate the aggravating and mitigating factors influencing the court's sentencing decision. The court identified the aggravating

factors, found no mitigating factors and re-sentenced defendant, imposing the sentence it originally imposed.

In August 2011, defendant filed an amended verified PCR petition and an accompanying brief filed on his behalf by assigned counsel. In seeking PCR, defendant urged his petition was not procedurally barred and that he had been denied effective assistance of counsel. Specifically, he claimed trial counsel coerced him into not testifying, failed to conduct an adequate pre-trial investigation, failed to mount a meaningful defense, and failed to seek a Wade[3] hearing concerning identification. Defendant additionally alleged the cumulative errors of defense counsel had the overall impact of denying him effective assistance of counsel.

The court conducted oral argument on the PCR application on September 30, 2011, and upon its conclusion, denied the petition. The court concluded defendant's claims were too vague, conclusory, and speculative. The present appeals followed.

On direct appeal, defendant raises the following points:

POINT I

DEFENDANT'S CONVICTIONS MUST BE REVERSED DUE TO THE PROSECUTOR'S IMPERMISSIBLE AND

_____

[3] United States v. Wade, 388 U.S. 218, 230, 87 S. Ct. 1926, 1932, 18 L. Ed. 2d 1149, 1158 (1967).

UNCONSTITUTIONAL PEREMPTORY JUROR CHALLENGES AND/OR THE INSUFFICIENT RECORD BELOW REGARDING THE PROSECUTOR'S PEREMPTORY JUROR CHALLENGES.

POINT II

DEFENDANT MUST BE RESENTENCED BECAUSE THE TRIAL COURT DOUBLE-COUNTED AGGRAVATING FACTORS (NOT RAISED BELOW).

Defendant's separate PCR appeal raises one point:

THIS MATTER MUST BE REMANDED FOR AN EVIDENTIARY HEARING BECAUSE DEFENDANT ESTABLISHED A PRIMA FACIE CASE OF TRIAL COUNSEL'S INEFFECTIVENESS.

A. TRIAL COUNSEL FAILED TO CONDUCT AN ADEQUATE INVESTIGATION AND LOCATE PROSPECTIVE WITNESSES

B. TRIAL COUNSEL COERCED DEFENDANT NOT TO TESTIFY

II.

In challenging the State's allegedly impermissible use of preemptory challenges, defendant contends the court erred in determining the prosecutor's notes were not subject to disclosure because they were protected by the attorney work product privilege. The trial judge indicated that it did not read Osorio as requiring that such notes be turned over.

Rule 3:13-3(d),[4] entitled "Documents Not Subject to Discovery[,]" states that "[t]his rule does not require discovery of a party's work product consisting of internal reports, memoranda or documents made by that party or his attorney or agents, in connection with the investigation, prosecution or defense of the matter[.]" "[P]rivileges stand in what we have declared to be a 'disfavored status' because they have an effect on the truth-seeking function." State v. Mauti, 208 N.J. 519, 531 (2012) (citing Payton v. N.J. Turnpike, 148 N.J. 524, 539 (1997)). Thus, "[t]he work product privilege is not absolute and can be disregarded 'upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the case and is unable without undue hardship to obtain the substantial equivalent of the materials by other means.'" Rivard v. Am. Home Prods., Inc., 391 N.J. Super. 129, 155 (App. Div. 2007) (quoting R. 4:10-2(c)).

No reported New Jersey decision has addressed the limits of attorney work product as it pertains to counsel's notes created during jury selection. The Georgia Supreme Court, however, found that a trial court properly denied defendant's motion for an in-camera review of the state's jury selection notes because

_____

[4] In effect at the time of the remand hearing was Rule 3:13-3(e). Rule amendments in 2014 re-designated this rule as Rule 3:13-3(d).

attorney work product does not become discoverable where there is no exculpatory information and the defense might find the information strategically helpful. Foster v. State, 374 S.E. 2d 188, 192 (Ga. 1988), cert. denied, 490 U.S. 1085, 109 S. Ct. 2110, 104 L. Ed. 2d 671 (1989).

Our Supreme Court, in Osorio, while summarizing the factual record presented to the trial court in the remand proceeding, noted that the "trial court accepted without qualification the State's explanations" for excusing prospective African-American and Hispanic jurors. Osorio, supra, 199 N.J. at 496. Ultimately, the Court concluded that, the limited record, the passage of more than seven years since jury selection, "the absence of searching judicial review" were all factors that militated against any remedy other than vacating the defendant's conviction and remanding the matter for a new trial. Id. at 509.

Here, at the inception of the remand hearing, defense counsel informed the court that defendant's prior trial counsel was practicing law in Colorado. The judge, in responding to defense counsel's request for the prosecutor's notes, acknowledged that his own notes were "limited to -- in most cases to merely an indication as to what peremptory challenges were exercised and the male [sic] -- and the sex and race of the

person who was excused. I didn't at all indicate whether or not there was some other basis that the court could observe."

As in Osorio, by the time of the remand hearing, a substantial period of time (here four years) had passed since the trial, and a different attorney was appearing on behalf of defendant. See Osorio, supra, 199 N.J. at 496 n.3. Therefore, a close and timely examination of the reasons proffered for utilizing seven of nine peremptory challenges to excuse prospective African-American jurors had not occurred. In addition, the trial court here, as it did in Osorio, "accepted without qualification the State's explanations." Id. at 496.

The responses to the relevant questions, by the seven jurors peremptorily excused, are largely borne out by the trial transcript, with the exception of Juror H. In the brief submitted in support of this appeal, defendant contends "the record below is devoid as to [Juror H's] brother having been tried and convicted for 'homicide[.]'" While the record does not state the nature of the conviction, the record does reflect that Juror H's brother was prosecuted for some offense involving his wife, Juror H had been subpoenaed as a witness. He believed the outcome was fair for "what he did."

Notwithstanding the fact that the transcripts of the jury selection confirmed the prosecutor accurately reported the

responses to the voir dire questions by the seven African-American jurors who were peremptorily excused, defense counsel, at the remand hearing, referenced that defendant remained at a "substantial disadvantage" because without the prosecutor's notes, the defense had "no means whatsoever of rebutting or responding." The prosecutor explained that her decisions as to each of the seven African-Americans were informed by their situation-specific responses to the voir dire questions.

Insomuch as reversal is required for other reasons, we need not resolve whether the State may successfully assert attorney work product privilege to prevent disclosure of its jury selection notes, where a defendant has established a prima facie showing of purposeful group discrimination in the jury selection process. We agree, however, generally, there would be no need for such disclosure where a claim of group bias is addressed during the course of jury selection. See Osorio, supra, 199 N.J. at 507-08 (stating because a clear pattern of group bias has been established with the State's first six peremptory challenges, it "behooved both the State and the trial court to [have made] make a contemporaneous record of the whys and wherefores on which the State's peremptory challenges were based"). Moreover, the demand for the prosecutor's notes presumes that in addition to making notes of a prospective

juror's responses to questions, a prosecutor routinely will also take the time to record his or her mental impressions about the response. We suspect this is not a likely scenario, which illustrates the importance of the third step under the Gilmore analysis.[5] Gilmore, supra, 103 N.J. at 539.

In Gilmore, the Court set forth the procedures for addressing a challenge to jury selection based upon group bias. Gilmore, supra, 103 N.J. at 535-38. The Court instructed that a defendant must first make a prima facie showing that the prosecution exercised its peremptory challenges to exclude jurors on constitutionally-impermissible grounds. Id. at 535-36. Second, if a defendant is able to satisfy this threshold showing, the prosecution then must present evidence that the challenged peremptory excusals were justified on the basis of "situation specific bias" rather than impermissible group bias.

---

[5] Nonetheless, in unique circumstances, where there has been a considerable passage of time, a new defense attorney, and an apparent absence of notes from the original trial counsel, a trial court may elect to conduct an in-camera review of the prosecutor's notes, if they exist, to determine whether the notes reflect the prosecution's representations. See Gaines v. State, 811 S.W.2d 245, 250 (Tex. Crim. App. 1991) (noting that the judge conducted an in-camera review where the prosecution objected to the production of its jury selection notes); U.S. v. Barnette, 644 F.3d 192, 199 (4th Cir. 2011) (discussing a remand hearing where the prosecutor's juror questionnaires were subjected to an in-camera review to determine the use of unconstitutional peremptory challenges).

_Id._ at 537. Third, if the prosecution provides such evidence of permissible situation-specific bias, then the court must evaluate the defendant's prima facie case of impermissible bias against the prosecution's rebuttal evidence of situation-specific bias to determine whether the defendant has satisfied his or her "ultimate burden of proving, by a preponderance of the evidence that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." _Id._ at 539.

It is this third critical step in the _Gilmore_ analysis that was not advanced by the court in the remand hearing. The Court in _Osorio_, _supra_, 199 _N.J._ at 506, noted that "the considerations relevant to this final step of the _Gilmore_ analysis were comprehensively summarized in [_Clark_, supra, 316 _N.J. Super._ at 473-74]," and the Court adopted those considerations, stating, "[w]e cannot improve on that summary[.]" _Osorio_, _supra_, 199 _N.J._ at 506. Thus, a trial court's analysis under the third step must include: (1) separate findings [by the court] as to the proffered reasons for peremptorily excusing the juror "'with respect to each disputed challenge'"; (2) whether the proffered reason has been evenly applied; the overall pattern of the use of peremptory challenges, notwithstanding that the proffered explanation as to

each individual juror excused, may appear "'genuine and reasonable'"; and (3) the "'composition of the jury ultimately selected to try the case.'" Osorio, supra, 199 N.J. at 506-07 (quoting Clark, supra, 316 N.J. Super. at 473-74).

Here, the trial court did not include in its findings any of the third-step considerations outlined in Clark, supra, 316 N.J. Super. at 473-74. Instead, the court credited the prosecutor's explanation wholesale and then mistakenly observed that defense counsel made "a point of saying -- that he could see those things as grounds just by reading the transcript." Defense counsel made no such concession. Rather, defense counsel acknowledged that "much of the information that the Prosecutor has indicated today is, of course, and naturally available on the . . . transcript of the jury selection. I reviewed those . . . transcripts. I noted many of the things that the Prosecutor has indicated here today." (Emphasis added). Defense counsel followed that statement by indicating to the court that his client was nonetheless at a "substantial disadvantage now because so much time has passed" and then renewed his request for the prosecutor's notes, once again urging that without the notes "we have no means whatsoever of rebutting or responding to what [the prosecutor] said."

Perhaps the court's omission of the necessary third-step analysis was influenced by its mistaken characterization of defense counsel's comments about what was contained in the trial transcript. In any event, the absence of a Gilmore third-step analysis left open the question whether the prosecutor's "nondiscriminatory reason for exercising a peremptory challenge which appear[ed] genuine and reasonable on its face [was] suspect if the only prospective jurors with that characteristic who the [party exercising the peremptory challenge] has excused are members of a cognizable group." See Osorio, supra, 199 N.J. at 506 (quoting Clark, supra, 316 N.J. Super. at 474).

The transcript of the jury selection process suggests that the State's proffered explanations may not have been evenly applied. For example, the prosecutor stated Juror B was excused, in part, because she was familiar with the address where the crime occurred, that a family member had been accused of drug possession, and she expressed dissatisfaction with the prosecution in a criminal case involving a family member. However, Juror Ch stated she has a family member who was accused of rape and drug possession, she, personally, had been held up twice, and remained dissatisfied that no one was arrested. Juror Ch, however, was not excused. Her race is not disclosed in the record because, other than those jurors peremptorily

excused by both sides, as reflected in the trial judge's notes, the record is devoid of the race of the prospective jurors other than the race of the jurors ultimately seated, as represented by the prosecutor during the remand hearing.

It is also important to note that the record, unfortunately, is silent with respect to responses by many prospective jurors on key questions, such as whether they were familiar with the crime area, and whether they or members of their family had been crime victims. A note from the transcriber, which appears on the cover page of the jury selection transcript states: "Due to the positioning of the microphones at sidebar and in the jury box, some portions of the transcript were difficult to hear."

In short, as in Osorio, the "scant record before us" in this case "does not instill confidence that the trial [judge] properly exercised [his] discretion in assessing the propriety of the contested peremptory challenges." Osorio, supra, 199 N.J. at 509. The failure to engage in the requisite third-step analysis mandated by the Supreme Court necessitates reversal.

At the time of our original remand in Thompson I, more than three years had passed since defendant's trial in 2007. Thompson I, supra, slip op. at 14. More than seven years has now elapsed. In the remand hearing, the judge stated that he

had "some vague recollection of the incidents as described." As noted earlier, the transcript of the proceedings is silent on juror responses to key questions and is limited as to the racial background of jurors, other than those peremptorily excused. We acknowledge the prosecutor represented, without challenge, the jury ultimately empaneled included "five African-American jurors and nine jurors who were not African-American." In a proper third-step analysis, the final composition of the empaneled jury is highly probative of the "ultimate question whether the . . . proffered nondiscriminatory reasons for exercising peremptory challenges are genuine and reasonable." Osorio, supra, 199 N.J. at 506-07 (quoting Clark, supra, 316 N.J. Super. at 474). That composition is, however, not dispositive.

"Given the precious constitutional rights at stake, we eschew any [further] intermediate measures" with a second remand. Ibid. We therefore are constrained to vacate defendant's conviction and remand for a new trial.

One final aspect of the record bears mentioning. It was represented to the court that defendant's former trial counsel was practicing law in Colorado at the time of the remand hearing, which was conducted several months after our decision in Thompson I. A defendant challenging the State's exercise of its peremptory challenges based upon impermissible

23

discrimination, through the appeal process, must be cognizant that the time between conviction and exhaustion of the appellate process may take years; and, therefore, it is foreseeable that a defendant's trial counsel in a remand proceeding may change. Nonetheless, the defendant bears the ultimate burden, by a preponderance of the evidence, to prove "that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias." Osorio, supra, 199 N.J. at 492.

A trial counsel's recollection of the jury selection process is undoubtedly critical to the court's third-step analysis. Thus, a defendant's failure to demonstrate, to the court's satisfaction, efforts to produce prior trial counsel, is also a factor relevant to the court's third-step analysis where new counsel appears. A trial court conducting such proceedings should not accept such representations of unavailability without more. See N.J.S.A. 2A:81-18 to 23 (providing a statutory means to compel the attendance of out-of-state witnesses in criminal proceedings); see also State v. Maben, 132 N.J. 487 (1993) (finding unacceptable the State's failure to secure forwarding address of crucial witness who left the state prior to the case being presented to the grand jury although fully aware of the family's plan to leave New Jersey); State v. Williams, 226 N.J.

<u>Super.</u> 94, 101, 103 (App. Div. 1988) (noting the impropriety of permitting prosecutor's reference to hearsay statement of witness the State failed to produce at trial and who the State failed to establish was unavailable within the meaning of <u>N.J.R.E.</u> 62(6)).[6] This failure to present evidence of due diligence to secure prior trial counsel's attendance at the remand hearing in this instance is not fatal, given the trial court's failure to engage in the third-step analysis.

In light of our decision vacating defendant's conviction, we need not address defendant's remaining point that the court double-counted the aggravating factors during the re-sentencing hearing. Nor need we address the points raised in defendant's separate appeal of the denial of his PCR petition.

Judgment of conviction vacated and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] <u>N.J.R.E.</u> 62(6), which addressed the concepts of declarant unavailability under the hearsay rules, has been replaced by <u>N.J.R.E.</u> 804.

A-1375-11T4