SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**State of New Jersey v. Saladin Thompson (A-47-14) (074971)**

**Argued December 1, 2015 -- Decided March 8, 2016**

**SOLOMON, J., writing for a unanimous Court.**

In this appeal, the Court considers the manner in which a trial court should evaluate challenges regarding the State's alleged use of racial discrimination in jury selection.

In July 2005, defendant committed a series of shootings, killing one man and injuring another. Thereafter, he was charged with murder and related offenses. During jury selection, the State exercised seven of its peremptory challenges to strike African-American prospective jurors. On the eve of trial, but before the jury was sworn, defendant's counsel raised a challenge pursuant to State v. Gilmore, 103 N.J. 508 (1986), in which he alleged racial discrimination in jury selection. The trial court dismissed the challenge. The case proceeded to trial where the jury convicted defendant of two counts of conspiracy to commit murder, and one count each of attempted murder, murder, simple assault, resisting arrest, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. The court imposed an aggregate 67-year term of incarceration, subject to an 85 percent period of parole ineligibility, pursuant to the No Early Release Act.

Defendant appealed, claiming that the trial court failed to engage in the three-step analysis mandated by Gilmore. The Appellate Division remanded the matter to the trial court to give the State an opportunity to articulate its reasons for excusing the African-American prospective jurors and for the court to determine whether defendant had proved by the preponderance of the evidence that the prosecution engaged in discrimination. On remand, defendant was represented by new counsel. The State provided the court with explanations as to why it used its peremptory challenges to excuse seven African-American jurors. Following the State's presentation, defense counsel acknowledged that the information provided by the prosecutor was supported by the transcript from jury selection, but insisted that defendant was at a disadvantage because of the time that has lapsed since trial. The trial court concluded that defendant had failed to prove that the State's use of peremptory challenges was constitutionally impermissible.

Defendant appealed, claiming again that the prosecution had used its peremptory challenges in a discriminatory manner. He also raised a sentencing claim. In a published opinion, the Appellate Division vacated the judgments of conviction and remanded for a new trial. 437 N.J. Super. 266 (App. Div. 2014). The panel found that the court's failure to conduct the three-step analysis mandated by Gilmore constituted error. The panel also observed that the State's explanations for the challenges may not have been evenly applied and that the record was silent with respect to responses by many prospective jurors on key questions. The panel did not reach defendant's sentencing claim. The Court granted certification. 221 N.J. 219 (2015).

**HELD**: The record below demonstrates that the prosecutor's race-neutral reasons for striking the jurors were supported by the record and that the trial court conducted an adequate Gilmore analysis. Therefore, the Appellate Division's reversal and remand for a new trial was inappropriate.

1. The United States Constitution forbids prosecutorial challenges to potential jurors solely based on race. Batson v. Kentucky, 476 U.S. 79 (1986). A defendant asserting the State's improper use of peremptory challenges must first make a prima facie showing that the challenge has been exercised on the basis of race. Once this burden is met, the prosecutor must offer a race-neutral basis for striking the juror in question. Thereafter, the trial court must determine whether the defendant has established intentional discrimination. (pp. 13-14)

2. Likewise, the New Jersey Constitution prohibits a prosecutor from exercising peremptory challenges on the basis of race. State v. Gilmore, 103 N.J. 508 (1986). Gilmore outlined a three-step analysis for trial courts to follow when adjudicating a claim of unconstitutional discrimination in the use of peremptory challenges. After defendant has rebutted the presumption of constitutionality by making a prima facie showing (step one) and the prosecutor has proffered an explanation based on permissible grounds (step two), Gilmore's third step is applied. In the third step, the trial court must judge the defendant's prima facie case against the prosecution's explanation to determine whether the defendant has carried the burden of proving that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias. (pp. 15-17)

3. In 2009, this Court revisited the trial court's obligation to conduct a three-step analysis when considering a challenge to the prosecutor's use of peremptory challenges. State v. Osorio, 199 N.J. 486 (2009). In doing so, the

1

Court reexamined the rule established in Gilmore and refined its three-step analysis. Accordingly, the trial court must assess whether the State has applied the proffered reasons even-handedly, the overall pattern of the use of peremptory challenges, and the composition of the jury ultimately selected to try the case. (pp. 17-20)

4. The federal standard of review for a trial court's factual determinations regarding a Batson claim is in line with Gilmore and this Court's well-settled law directing appellate courts to give deference to trial court findings based on its opportunity to hear and observe witnesses. Here, defendant's Gilmore objection, while timely, was made five days into jury selection on the scheduled first day of trial, after challenges had been exercised and prospective jurors excused, but before the jury was sworn. In support of his objection, defense counsel stated only that the prosecutor used seven of nine peremptory challenges to excuse African-American prospective jurors. The court did not inquire any further, concluding that defendant had failed to make establish a prima facie claim that the prosecution had used its peremptory challenges in a discriminatory manner. (pp. 22-24)

5. Under Gilmore, the analysis ends if the trial court finds that defendant failed to meet his initial burden of establishing a prima facie case of purposeful discrimination. The better practice is to allow the State to make a record of its reasons for exercising its peremptory challenges. Because this did not occur, there was sufficient support for the initial remand ordered by the Appellate Division. On remand, the prosecutor presented race-neutral reasons for excusing each African-American prospective juror, reminded the court that the final composition of the empaneled jury included a higher percentage of African Americans than the venire, and explained that the State's strategy benefited from having African-American jurors because two of the three victims in this case were also African American. (pp. 25-26)

6. On appeal from the remand hearing, the Appellate Division found that the trial court failed to advance to the third step in the Gilmore analysis and that the transcript of the jury selection process suggested that the State's proffered explanations may not have been evenly applied. Based on those purported failures, the panel incorrectly reversed defendant's convictions and remanded for a new trial. The Appellate Division ignored the trial court's credibility findings, canvassed the record to find an example of the prosecutor's supposed uneven application of peremptory challenges and misapplied Osorio and Gilmore. The remand court in this case gave defendant an opportunity, in response to the State's explanations, to provide information beyond the fact that seven of the nine peremptory challenges were against African-American prospective jurors. That defendant was unable to do so supports the court's conclusion that defendant failed to carry his ultimate burden and, under this Court's deferential standard of review, militates against the Appellate Division's reversal. Nothing in Gilmore or Osorio placed the onus on the court to comb the record for instances where a juror selected provided answers similar to the reasons the State proffered for its use of a peremptory challenge; it is the defendant's obligation to do so. In light of the remand record, and pursuant to a deferential standard of review, the trial court conducted an adequate Gilmore analysis and its findings were not erroneous. (pp. 27-30)

The judgment of the Appellate Division is **REVERSED**. Defendant's convictions are **REINSTATED** and the matter is **REMANDED** to the Appellate Division for consideration of defendant's sentencing claim.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

SALADIN THOMPSON,

    Defendant-Respondent.


Argued December 1, 2015 – Decided March 8, 2016

On certification to the Superior Court, Appellate Division, whose opinion is reported at 437 N.J. Super. 266 (App. Div. 2014).

Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor argued the cause for appellant (Carolyn A. Murray, Acting Essex County Prosecutor, attorney; Mr. Ducoat and Sara A. Friedman, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

Stefan Van Jura, Deputy Public Defender II, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney).

Jenny M. Hsu, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (John J. Hoffman, Acting Attorney General, attorney).


JUSTICE SOLOMON delivered the opinion of the Court.

On a single evening in July 2005, defendant committed a series of shootings in Irvington, killing one man and injuring

two others.  Defendant, who is African American, was charged with first-degree murder and related offenses.

During jury selection, the State exercised nine of its twelve peremptory challenges; seven of the nine were used to strike African-American prospective jurors.  On the eve of trial, but before the jury was sworn, defendant's trial counsel raised a challenge pursuant to State v. Gilmore, 103 N.J. 508 (1986), alleging racial discrimination in the jury selection process.  Because counsel was unable to substantiate the allegation beyond noting that the majority of the prosecutor's challenges targeted African Americans, the trial court dismissed the challenge and the case proceeded to trial.

Following trial, a jury convicted defendant of various offenses, including first-degree murder and attempted murder. Thereafter, the court sentenced defendant to an aggregate term of sixty-seven years of imprisonment subject to an eighty-five percent period of parole ineligibility.  On appeal, the Appellate Division determined that defendant made a prima facie showing of discrimination with respect to the prosecutor's use of peremptory challenges, and remanded for the trial court to conduct an inquiry into the jury-selection process.

At the remand hearing, the State provided explanations for its use of the peremptory challenges.  Defense counsel, who did not represent defendant at trial, acknowledged that the

2

information provided by the prosecutor was supported by the transcripts of jury selection, and offered nothing further. Instead, counsel claimed he was at a disadvantage due to the passage of time and because defendant's trial counsel, who had moved to Colorado, was unavailable for the hearing. The court then credited the State's explanations, indicating that they were supported by the record, and dismissed defendant's Gilmore challenge.

Defendant again appealed, and the Appellate Division reversed his convictions and remanded for a new trial because the trial court failed to assess whether the State's explanations were genuine and applied evenhandedly.

We granted the State's petition for certification, 221 N.J. 219 (2015), and now reverse the judgment of the Appellate Division and reinstate defendant's convictions.

I.

A.

For context, we recount briefly the facts of the underlying incident which led to defendant's indictment.

Tony Andrews was on his porch when two African-American males fired four or five gunshots, wounding him. After firing the initial rounds of bullets, one of the two men approached Andrews and attempted to shoot him in the face but narrowly missed. When officers arrived on the scene, they found Andrews

3

lying in the hallway of the residence, bleeding from his right shoulder.

On the same evening, two men approached a restaurant located near the scene of the Andrews' shooting. One of the men waited outside while the other entered briefly to purchase cigarettes. As he exited the restaurant, an employee later identified as Leno Zhou, noticed the man drawing a gun. Once outside, both men began firing. Zhou heard four gunshots and realized that he had been shot in the leg and that a patron, Nibal Green, had been shot and killed.

After receiving treatment for his leg, Zhou was taken to the police station where he identified defendant from a photo array as one of the shooters. Defendant was apprehended later that evening following a car and foot pursuit. One of the pursuing officers recovered a gun discarded by defendant as he attempted to flee. Ballistics confirmed that bullets and casings found at the scene of both shootings had been fired from that weapon.

An Essex County grand jury indicted defendant on two counts of first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a); two counts of first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a); first-degree murder, N.J.S.A. 2C:11-3(a)(1) and N.J.S.A. 2C:11-3(a)(2); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-

4

5(b); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree aggravated assault, N.J.S.A. 2C:12-1(b); third-degree receipt of stolen property, N.J.S.A. 2C:20-7; and third-degree resisting arrest, N.J.S.A. 2C:29-2.

B.

In anticipation of trial, a pool of prospective jurors consisting of thirty African Americans and sixty-five non-African Americans was brought to the courtroom. During jury selection, the State used seven of its nine peremptory challenges[1] to strike African Americans from the jury venire. The final jury panel was comprised of five African-American and nine non-African-American jurors.

On the first day of trial, five days after the jury was selected but before it was sworn, defense counsel raised a Gilmore challenge, alleging that the State exercised its peremptory challenges in a discriminatory manner. To support his challenge, defense counsel cited only the prosecutor's use of seven of her nine challenges to strike African Americans. The trial judge asked defense counsel, "Got anything else[,]" and counsel replied, "I think that's it." The prosecutor "vigorously oppose[d]" counsel's Gilmore challenge, asserting

---

[1] The prosecutor was entitled to a total of twelve peremptory challenges pursuant to Rule 1:8-3(d).

that defendant failed to establish a prima facie case of discrimination and denying that the State used its "p[er]emptory challenges to systematically exclude members of . . . any group, whether it be racial, gender, or otherwise."  The State further pointed out that there were "a significant number of individuals of African-American descent seated on the current jury, which we expect to be sworn."

The prosecutor then offered to explain her use of peremptory challenges, but submitted that "since no prima facie case has been made of a systematic exclusion of individuals . . . there has been no grounds put forward for going any further in the procedure set forth in the Gilmore case."  Without asking for further explanation from the prosecutor or additional argument from defense counsel, the trial court summarily dismissed defendant's Gilmore challenge, stating that "[t]here being no prima facie case being made with regard to a discriminatory pattern of jury selection on behalf of the State, no further inquiry of this Court is necessary.  The issue is over."

Thereafter, the jury, which included five African Americans, was sworn and the trial proceeded to conclusion. Defendant was convicted of two counts of first-degree conspiracy to commit murder, first-degree attempted murder, first-degree murder, third-degree unlawful possession of a weapon, second-

6

degree possession of a weapon for an unlawful purpose, simple assault, and fourth-degree resisting arrest. The court sentenced defendant to an aggregate sixty-seven-year prison term subject to an eighty-five percent parole disqualifier pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2.

C.

Defendant appealed his conviction. He argued, among other things,[2] that the trial court failed to engage in the three-step analysis mandated by Gilmore, supra, 103 N.J. at 537-38.

The Appellate Division remanded,[3]

> to afford the prosecution the opportunity to articulate its reasons for excusing the seven African-American prospective jurors and for the court to then weigh those reasons against defendant's prima facie case in order to determine whether defendant has met his ultimate burden of proving by the preponderance of the evidence that the prosecution engaged in impermissible discrimination in exercising its peremptory challenges.

This Court denied defendant's petition for certification. State v. Thompson, 203 N.J. 439 (2010).

---

[2] Defendant also claimed the trial court: (1) erred in its jury instruction on identification; and (2) subjected defendant to disparate treatment when it imposed a custodial sentence greater than the sentence received by his co-defendant.

[3] Prior to the remand hearing, defendant filed a pro se petition for post-conviction relief (PCR). The PCR proceeding was not adjudicated until several months after the remand hearing and is not relevant for the purposes of this appeal.

D.

At the remand hearing, defendant was represented by new counsel, who had to rely on trial transcripts of the jury selection process because defendant's trial counsel had since moved to and was practicing law in Colorado; trial counsel certified that he had no notes, files, or significant recollection of the jury selection. As such, remand counsel requested copies of the prosecutor's notes from jury selection, citing State v. Osorio, 199 N.J. 486 (2009). The court denied defendant's application, concluding that Osorio did not require such notes to be turned over, but offered to provide counsel with its own notes which were limited, for the most part, to gender and race. It is unclear from the record whether defense counsel accepted this offer.

The prosecutor, who also represented the State at trial, then provided the court with the following explanations for the State's exercise of peremptory challenges to excuse seven African-American prospective jurors:[4]

> *Juror B*, who initially asked to be excused out of concern that serving on the jury may affect her probationary work status, was excused because she was familiar with the address where the crime occurred, had a family member previously accused of drug possession, and had been dissatisfied with the prosecution in a prior case in which a family member was the victim of a hit-and-run accident.

---

[4] In the interest of privacy, the jurors are referred to by initials.

*Juror G* was excused because her boyfriend, who is also the father of her child, had been convicted of and was on probation for weapons charges, and his prosecution was undertaken by Essex County, the same office prosecuting defendant's case.

*Juror Gr*, who indicated that she hosted adult-themed "passion parties," was dismissed because she had been involved in a domestic violence case which had been initially prosecuted and subsequently dismissed by the Essex County Prosecutor's Office and "the aggregate effect of those statements . . . cause[d] [the prosecutor] to have a reaction that she would not be a juror who would be equally open to the State's evidence in this matter."

*Juror H*, who worked in a half-way house and had a daughter who had been laid off from her job as a Corrections Officer, was excused because she was once subpoenaed as a witness, but did not ultimately testify, in a trial where her brother was convicted of homicide.

*Juror Go* was excused because he had been previously prosecuted by the Essex County Prosecutor's Office in connection with a case that was eventually "thrown out" in which his son was the alleged victim.

*Juror Mk*, who expressed that she was very religious and indicated that she read daily meditations and regularly attended "meetings" of a possible religious nature, was excused because, after being denied an opportunity to ask follow-up questions, the prosecutor "felt that she might, in fact, be disturbed in sitting in judgment upon another individual, particularly in something as serious as a murder case."

*Juror Jn* was dismissed because during voir dire he provided a "deliberately misleading" statement that neither he nor any member of his family had ever been charged with an offense. In actuality, the prosecutor was aware, and the juror subsequently admitted, that he and his brothers were facing assault charges in Essex County at the time of trial.

The prosecutor also noted that thirty of the ninety-five potential jurors in defendant's case, or approximately 31.5%,

9

"appeared to be African-American."  By comparison, the final jury was 35.7% African American –- five of the fourteen jurors[5] were African American.  Finally, the prosecutor explained that

> with two African-American victims, one of whom was murdered and one of whom was only saved by the fact that one of the guns did not fire initially against his head . . . there was no intention on the part of the State to exclude African-Americans from this jury.  It would not be, in my view, sound trial strategy and the exercise of peremptory challenges was done for situations, specific reasons, and without any intent to exclude a particular race, without any intent to exclude African-Americans.

Following the prosecutor's presentation, the court asked defense counsel, "you have anything?"  Defense counsel acknowledged that much of the information provided by the prosecutor was supported by the transcript of jury selection, but insisted that the defense was "at a substantial disadvantage now because so much time has past [sic] and because Mr. Rosen, the trial attorney, is not here."  Defense counsel also renewed his application to review the prosecutor's notes from jury selection, which the court, once again, denied.  The court then held that defendant failed to carry his ultimate burden of proving that the State's use of peremptory challenges was constitutionally impermissible.  In making this determination,

---

[5] Twelve jurors deliberate on a verdict and two serve as alternates in the event that a juror is unable to continue serving to verdict.

10

the court found that the prosecutor's stated reasons for excusing the seven African-American prospective jurors were credible and that the State "did not engage in impermissible discrimination in exercising its peremptory challenges."

Defendant appealed for a second time, arguing, among other things,[6] that his convictions must be reversed because the prosecutor's peremptory challenges were impermissible and unconstitutional, and the record below regarding the challenges was insufficient.

In a published opinion, the Appellate Division vacated the judgment of conviction and remanded for a new trial. State v. Thompson, 437 N.J. Super. 266 (App. Div. 2014). Relying on Osorio, supra, the panel concluded that the failure of the court to conduct "a Gilmore third-step analysis left open the question whether the prosecutor's 'nondiscriminatory reason for exercising a peremptory challenge which appear[ed] genuine and reasonable on its face [was] suspect if the only prospective jurors with that characteristic who the [prosecutor] has excused are members of a cognizable group.'" Id. at 280 (quoting Osorio, supra, 199 N.J. at 506) (citation omitted).

---

[6] Defendant also claimed that the court impermissibly double-counted aggravating factors during the re-sentencing hearing. This contention was not reached by the Appellate Division.

The panel then engaged in its own review of the jury selection transcript and found that "the State's proffered explanations may not have been evenly applied." Ibid. Specifically, the panel claimed that although the prosecutor excused Juror B, who was African American, she did not excuse Juror Ch even though her answers to questions during voir dire were similar to Juror B's responses. Ibid. The panel acknowledged that the race of Juror Ch was not recorded.[7] Ibid.

The panel continued, "[i]t is also important to note that the record, unfortunately, is silent with respect to responses by many prospective jurors on key questions, such as whether they were familiar with the crime area, and whether they or members of their family had been crime victims." Id. at 280-81. Thus, it stated that

> as in Osorio, the 'scant record before us' in this case 'does not instill confidence that the trial [judge] properly exercised [his] discretion in assessing the propriety of the contested peremptory challenges.' The failure to engage in the requisite third-step analysis mandated by the Supreme Court necessitates reversal.
>
> [Id. at 281 (internal citation and quotation marks omitted).]

---

[7] In its supplemental brief to this Court, the State represented that Ch was, in fact, African-American. This assertion has not been contested by defendant. We reiterate that on remand the trial court offered to hand over its own notes, which consisted of the sex and race of prospective jurors. It is unclear from the record whether defense counsel accepted this offer.

12

The Appellate Division did not reach the issue of disclosure of the prosecutor's jury selection notes, and this question is not addressed here.[8]

## II.

## A.

We begin with a review of the basic principles governing a challenge to the State's use of peremptory challenges to excuse minority jurors.

In Batson v. Kentucky, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race."  476 U.S. 79, 89, 106 S. Ct. 1712, 1719, 90 L. Ed. 2d 69, 83 (1986).  A defendant asserting the State's improper use of peremptory challenges under Batson must first "make a prima facie showing that a peremptory challenge has been exercised on the basis of race."  Snyder v. Louisiana, 552 U.S. 472, 476, 128 S. Ct. 1203, 1207, 170 L. Ed. 2d 175, 180 (2008) (citations and quotation marks omitted).  Once this burden has been met, the prosecutor "must offer a race-neutral basis for striking the juror in question."  Id. at 477, 128 S. Ct. at 1207, 170 L. Ed. 2d at 180.  Thereafter, the trial court is

---

[8] Defendant now "agrees with the State that a criminal defendant is not entitled to a prosecutor's notes by virtue of establishing a prime facie case under Gilmore."

tasked with determining whether the defendant has established intentional discrimination, "in light of the parties' submissions."  Id. at 477, 128 S. Ct. at 1207, 170 L. Ed. 2d at 181.

Batson's first two steps "govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim."  Johnson v. California, 545 U.S. 162, 171, 125 S. Ct. 2410, 2417-18, 162 L. Ed. 2d 129, 140 (2005).  "It is not until the third step that the persuasiveness of the justification becomes relevant -- the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination."  Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771, 131 L. Ed. 2d 834, 839 (1995) (citations omitted).

Under the Batson framework, the defendant shoulders the ultimate "burden of persuasion" to "prove the existence of purposeful discrimination."  Batson, supra, 476 U.S. at 93, 106 S. Ct. at 1721, 90 L. Ed. 2d at 85 (internal quotation marks and citations omitted).  This burden "rests with, and never shifts from, the opponent of the strike."  Purkett, supra, 514 U.S. at 768, 115 S. Ct. at 1771, 131 L. Ed. 2d at 839.  Discriminatory intent "may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination."

14

Hernandez v. New York, 500 U.S. 352, 373, 111 S. Ct. 1859, 1873, 114 L. Ed. 2d 395, 415 (1991) (O'Connor, J., concurring) (citations and quotation marks omitted). However, the United States Supreme Court has cautioned that "[t]he inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." Johnson, supra, 545 U.S. at 172, 125 S. Ct. at 2418, 162 L. Ed. 2d at 140-41. Thus, "if . . . the trial court believes the prosecutor's nonracial justification, and that finding is not clearly erroneous, that is the end of the matter." Hernandez, supra, 500 U.S. at 375, 111 S. Ct. at 1875, 114 L. Ed. 2d at 416 (O'Connor, J., concurring).

Less than three months after Batson was handed down, this Court, in Gilmore, supra, determined that the provisions of the New Jersey Constitution, Article I, Paragraphs five, nine, and ten, likewise prohibited a prosecutor from exercising peremptory challenges on the basis of religious principles, race, color, ancestry, national origin, or sex. 103 N.J. at 524-29. Building on the principles articulated in Batson, the Gilmore Court outlined a similar three-step analysis for trial courts to follow when adjudicating a claim of unconstitutional discrimination in the use of peremptory challenges. Id. at 533-39.

15

That analysis begins with the "rebuttable presumption that the prosecution has exercised its peremptory challenges on" constitutionally permissible grounds. Id. at 535. From there, the Gilmore Court instructed that, as the first step, "[t]his presumption may be rebutted . . . upon a defendant's prima facie showing that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds." Ibid. To make out a prima facie claim, Gilmore required a defendant to "initially . . . establish that the potential jurors wholly or disproportionally excluded were members of a cognizable group," and then that "there is a substantial likelihood that the peremptory challenges resulting in the exclusion were based on assumptions about group bias rather than any indication of situation-specific bias." Id. at 535-36.

Once the trial court is satisfied that the defendant has made this prima facie showing, "[t]he burden shifts to the prosecution to come forward with evidence that the peremptory challenges under review are justifiable on the basis of concerns about situation-specific bias." Id. at 537. This is accomplished by the prosecutor "articulat[ing] 'clear and reasonably specific' explanations of its 'legitimate reasons' for exercising each of the peremptory challenges." Ibid. (quoting Tex. Dep't. of Cmty. Affairs v. Burdine, 450 U.S. 248, 258, 101 S. Ct. 1089, 1096, 67 L. Ed. 2d 207, 218 (1981)). The

16

State's explanations, "if they appear to be genuine, should be accepted by the court, which will bear the responsibility of assessing the genuineness of the prosecutor's response and of being alert to reasons that are pretextual." Id. at 538 (quoting McCray v. Abrams, 750 F.2d 1113, 1132 (2d Cir. 1984)).

After the defendant has rebutted the presumption of constitutionality by making a prima facie showing (step one) and the prosecutor has proffered an explanation based on permissible grounds (step two), Gilmore's third step is applied. In this last step of the analysis, "the trial court must judge the defendant's prima facie case against the prosecution's rebuttal to determine whether the defendant has carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." Id. at 539.

We revisited the trial court's obligation to conduct a three-step analysis when considering a challenge to the prosecutor's use of peremptory challenges in Osorio. In that case, defendant, a Hispanic male, was arrested and charged with various drug-related offenses. Osorio, supra, 199 N.J. at 493. During jury selection, the prosecutor used her first six peremptory challenges to strike African-American and Hispanic jurors. Ibid. Defense counsel raised a Gilmore challenge, but

17

the trial court summarily rejected the objection without requiring an explanation from the State.  Ibid.  After the prosecutor used her next challenge to dismiss an African-American juror, the court asked for an explanation.  Id. at 493-94.  The prosecutor claimed that the juror appeared to be sleeping, and the court stated that it was "satisfied" without inviting the prosecutor's justification for the first six peremptory challenges or any response from defense counsel.  Id. at 494.

On appeal, the Appellate Division affirmed defendant's convictions, but remanded to the trial court for the prosecutor to justify her reasons for striking the minority jurors.  Ibid.  At the remand hearing, the prosecutor stated, "Juror Number 9, from Newark, and Juror Number 10, from East Orange, both Hispanic females seated next to each other, were excused because they were 'giggling [and] high[-]fiving when a juror in the back row was excused' and were 'making faces[.]'"  Id. at 495.  Without the benefit of its own trial notes or "separate recollection of the jury selection process," the trial court accepted the prosecutor's representations, did not allow defense counsel to respond and, once again, rejected the defendant's Gilmore challenge.  Id. at 496.

Defense counsel later sought to supplement the remand record, claiming that the prosecutor's representations regarding

18

Jurors 9 and 10 did not "conform to his recollection, [and] . . . that he 'remember[ed] those two people very well,'" and they did not engage in any of the gesturing described by the prosecutor. Ibid. In light of this factual dispute, the delay in time, and the prosecutor's "failure to apply the purported reason[s] for the excusal" even-handedly,[9] the Appellate Division reversed and remanded for a new trial. Id. at 498.

We affirmed the Appellate Division's grant of a new trial. In doing so, we reexamined the rule established in Gilmore and refined its three-step analysis. First, we modified the "substantial likelihood" standard set forth in the first step of the Gilmore analysis in light of Johnson, supra, which "ma[de] clear that the burden to overcome the presumption of constitutionality of a peremptory challenge exercise is far less exacting than was originally stated in Gilmore." 103 N.J. at 502. Thus, we reduced Gilmore's "substantial likelihood"

___

[9] Apparently, four out of the twenty-one prospective jurors who indicated that either they, a relative, or a friend had been a crime-victim were seated on the jury. State v. Osorio, 402 N.J. Super. 93, 107-08 (App. Div. 2008). However, the prosecutor excused an African-American juror, who was the only prospective juror to state that the perpetrator "got off," even though others who reported that the perpetrator was never apprehended were not subject to peremptory excusal by the State. Id. at 108. The Appellate Division had "difficulty understanding how a prosecutor could [conclude] that a prospective juror who felt that the perpetrator of a crime against a family member 'got off' would be biased against the State, but that prospective jurors who had been informed the perpetrator had not been apprehended would not have such bias." Ibid.

19

standard to the less-onerous "inference" standard set forth in Johnson.  Ibid.; see Johnson, supra, 545 U.S. at 170, 125 S. Ct. at 2417, 162 L. Ed. 2d at 139 (clarifying that "a defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred").

Next, we reiterated that the third step of the Gilmore analysis requires the trial court to "weigh the proofs . . . and determine whether, by a preponderance of the evidence, the party contesting the exercise of a peremptory challenge has proven that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias."  Osorio, supra, 199 N.J. at 492-93.  In conducting this last phase of the analysis, the court must assess, among other things, whether the State has applied the proffered reasons "even-handedly to all prospective jurors"; the "overall pattern" of the use of peremptory challenges; and "the composition of the jury ultimately selected to try the case."  Id. at 506 (quoting State v. Clark, 316 N.J. Super. 462, 473-74 (App. Div. 1998), appeal after remand, 324 N.J. Super. 558 (App. Div. 1999), certif. denied, 163 N.J. 10 (2000)).  In the end, we concluded that a second remand seven years after jury selection would have been futile, and that a new trial was required because there were irreconcilable factual issues regarding two of the

peremptorily challenged jurors that could not be resolved by the "scant record before us." Id. at 509.

B.

Guided by these principles, we turn to the applicable standard of review. To begin, we note that in the instant case the Appellate Division did not articulate the standard it employed when reviewing the trial court's determinations on remand. In addition, our review of this Court's jurisprudence reveals that we have not enunciated the standard to be applied to a trial court's findings under the Gilmore analysis.

In Clark, supra, the Appellate Division noted that "[a]n Appellate Court will extend substantial deference to a trial court's findings relating to whether the prosecution has exercised its peremptory challenges on constitutionally-impermissible grounds." 316 N.J. Super. at 473. This deferential standard is similar to that applied by the federal courts where, "[t]he opponent of the strike bears the burden of persuasion regarding racial motivation, and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference." Davis v. Ayala, __ U.S. __, __, 135 S. Ct. 2187, 2199, 192 L. Ed. 2d 323, 335 (2015) (internal citations and quotation marks omitted). Thus, under federal law, "[o]n appeal, a trial court's ruling on the issue of discriminatory

21

intent must be sustained unless it is clearly erroneous." Snyder, supra, 552 U.S. at 477, 128 S. Ct. at 1207-08, 170 L. Ed. 2d at 181 (citations omitted).

We find the federal standard of review for a trial court's factual determinations regarding a Batson claim to be appropriate under Gilmore and in line with our own well-settled body of law directing appellate courts to "'give deference to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Elders, 192 N.J. 224, 243 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Indeed, "[a]n appellate court should not disturb the trial court's findings merely because 'it might have reached a different conclusion were it the trial tribunal' or because 'the trial court decided all evidence or inference conflicts in favor of one side' in a close case." Id. at 244 (quoting Johnson, supra, 42 N.J. at 162). Therefore, "[a] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" Ibid. (quoting Johnson, supra, 42 N.J. at 162). This standard, we note, necessarily applies to the trial court's assessment of the prosecutor's candor and sincerity in the presentation of reasons for exercising peremptory challenges. See State v.

22

Williams, 113 N.J. 393, 411 (1988) (acknowledging that appellate courts are "'perhaps too far removed' from the realities of the voir dire to appreciate the nuances concealed by a 'bloodless record'; therefore deference to the trial court is usually prudent") (quoting Gilmore, supra, 103 N.J. at 547 (Clifford, J., dissenting)).

## III.

With this deferential standard in mind, we apply the law applicable to defendant's challenge of the prosecutor's use of peremptory challenges. In doing so, we must resolve whether defendant is entitled to a new trial owing to the remand court's purported failure to balance defendant's prima facie case against the prosecution's rebuttal evidence to determine whether defendant carried the ultimate burden of proving, by a preponderance of the evidence, that the prosecution "exercised its peremptory challenges on constitutionally-impermissible grounds." Gilmore, supra, 103 N.J. at 539.

At the outset, we note that defendant's Gilmore objection, while timely, was made five days into jury selection on the scheduled first day of trial, after challenges had been exercised and prospective jurors excused, but before the jury was sworn. Furthermore, in support of his objection, defense counsel presented only that the prosecutor used seven of her nine peremptory challenges to excuse African-American

23

prospective jurors.  When the trial court asked counsel to elaborate further, he was unable to do so.

The prosecutor then argued that defendant failed to establish a prima facie case, but nonetheless offered that "[i]f the Court wishes, I can with a few moments make a record clearly about the current composition as the State sees it of the sitting jury."  The court responded by saying merely that defendant had failed to establish a "prima facie case . . . with regard to a discriminatory pattern of jury selection on behalf of the State, [and that] no further inquiry of this Court is necessary."  This conclusion by the court was incorrect because defendant established a prima facie claim by pointing out that the prosecutor exercised seven of the nine peremptory challenges to strike African Americans.  See Osorio, supra, 199 N.J. at 503 (noting that a defendant meets his burden under the first step of the Gilmore analysis by showing that the State "has used a disproportionate number of [its] peremptories against [a cognizable] group") (citations and quotation marks omitted).

As emphasized in Gilmore, supra, we require a defendant's timely[10] objection to the prosecution's use of peremptory challenges in order to "facilitate the development of as

---

[10] A Gilmore challenge is timely so long as it is raised "during or at the end of the jury selection, but before the petit jury is sworn."  Gilmore, supra, 103 N.J. at 535.

complete a record of the circumstances as is feasible, as well as enabling the trial court to make a fairer determination." 103 N.J. at 535. Here, the trial court failed to allow development of as complete a record as possible when it did not require the prosecutor to justify, before the jury was sworn, her use of seven out of nine peremptory challenges to remove African Americans. Although, in this instance, the prosecutor argued, and the trial court agreed, that defendant failed to make out a prima facie case of purposeful discrimination, we cannot condone the trial court's decision to summarily end the inquiry at this stage.

We acknowledge that, under Gilmore, the analysis ends if the trial court finds that defendant failed to meet his initial burden of establishing a prima facie case of purposeful discrimination. However, as a practical matter, the better practice is to allow the State to make a record of its reasons for exercising its peremptory challenges, especially where, as here, the prosecutor offers to do so. Because this did not occur there was sufficient support for the initial remand ordered by the Appellate Division. Of course, given what occurred on remand and the extreme remedy imposed by the Appellate Division thereafter, our analysis does not end here.

On remand, the prosecutor presented race-neutral reasons for excusing each African-American prospective juror, reminded

25

the court that the final composition of the empaneled jury included a higher percentage of African Americans than the venire, and explained that the State's trial strategy benefited from having African-American jurors because two of the three victims in this case were also African American. When asked to respond, defense counsel replied by acknowledging the general accuracy of the prosecutor's representations based on the trial record, and that it had nothing more to add, emphasizing that it was disadvantaged by the lapse in time and lack of notes from defendant's trial counsel.[11] Balancing the State's representations, which the court found to be credible and reasonable, against defense counsel's failure to point to any facts to support his argument of purposeful discrimination, the trial court determined that defendant did not carry his ultimate burden under <u>Gilmore</u> and denied defendant's application.

Nevertheless, on appeal from the remand hearing, the Appellate Division found that the trial court failed to advance the "third critical step in the <u>Gilmore</u> analysis" and, furthermore, that "[t]he transcript of the jury selection

---

[11] Defense counsel's contention that he was at a disadvantage because of the passage of time and the lack of notes from defendant's trial counsel who certified that he had no notes or recollection of the jury selection process, does not excuse defendant's responsibility to demonstrate, by a preponderance of the evidence, that the prosecution "exercised its peremptory challenges on constitutionally-impermissible grounds of presumed group bias." <u>Gilmore</u>, <u>supra</u>, 103 <u>N.J.</u> at 539.

26

process suggests that the State's proffered explanations may not have been evenly applied." Based on those purported failures, and relying on our prior decision in Osorio, the panel reversed defendant's convictions and remanded for a new trial.

In Osorio, we held that a proper Gilmore analysis must include a careful weighing of whether the reasons proffered for the challenges were applied even-handedly to all prospective jurors, against a consideration of the overall pattern of the State's use of peremptory challenges and the composition of the jury ultimately empaneled. 199 N.J. at 506-07. This analysis presumes that a defendant will present information beyond the racial makeup of the excused jurors. The Appellate Division found in Osorio, and we agreed, that the seven years since jury selection made remand useless to resolve the factual issues raised by defense counsel -- namely, that the prosecutor's representations about the jurors peremptorily stricken were inaccurate. Id. at 508. Consequently, our focus in Osorio was on the failure of the trial court to address the challenges during the jury selection process while each party's recollection was fresh. Id. at 507-08.

In this case, in order to justify vacating defendant's conviction and remanding the matter for a new trial, the Appellate Division ignored the trial court's credibility findings, canvassed the record to find an "example" of the

27

prosecutor's supposed uneven application of peremptory challenges, and misread and misapplied Osorio's requirement that a defendant carry the ultimate burden of persuasion under Gilmore. Like Osorio, several years have elapsed between defendant's trial and remand by the Appellate Division, and several more have gone by since defendant's second appeal. However, unlike in Osorio, defendant failed to present to the remand court, the Appellate Division, or this Court any factual contentions concerning any of the prospective jurors. Additionally, the reasons given by the prosecutor for exercising her peremptory challenges against seven African-American prospective jurors did not involve disputed facts that could not be resolved by the record.

The present case differs from Osorio in two additional respects. First, the remand court here compared the racial composition of the venire to the empaneled jury. Second, the remand court in this case gave defendant an opportunity, in response to the State's explanations, to provide information beyond the fact that seven of the nine peremptory challenges were against African-American prospective jurors. That defendant was unable to do so supports the court's conclusion that defendant failed to carry his ultimate burden and, under our deferential standard of review, militates against the Appellate Division's reversal.

28

In light of defense counsel's responses, the remand court here would have had to conduct an independent, unassisted investigation of the record in order to undertake the analysis required by Osorio because defendant did not present any information or point to any part of the record that would facilitate such an analysis. Nothing in Gilmore or Osorio placed the onus on the court to comb the record for instances where a juror selected provided answers similar to the reasons the State proffered for its use of a peremptory challenge; it is the defendant's obligation to do so.

The perils of such a belated review of the record are highlighted here, where the Appellate Division accused the State of administering its challenges unevenly. To support this accusation, the panel culled through the record and located a single instance in which it found the prosecutor may have dismissed an African American from the venire while choosing not to remove a similarly situated prospective juror whose race was not reflected in the record. Setting aside our reservations about this practice, the panel's underlying assumption that the juror in question was not a member of a cognizable group appears to have been incorrect. As the State noted in its supplemental petition to this Court, that juror who was seated was, in fact, also African American. Moreover, the acknowledged failure of defendant to counter any of the prosecutor's suggestions or

29

raise an "uneven application" argument made it impossible for the court to "include in its findings any of the third-step considerations" outlined in Osorio. Indeed, such an analysis of the parties' contentions would have provided no more information than is contained in the trial and remand records.

As we stated in Osorio, the emphasis must be on properly resolving this issue in a timely manner -- ideally during the course of the jury-selection process. Osorio, supra, 199 N.J. at 508-09. Accordingly, a contemporaneous review is most conducive to resolution of those challenges because a detailed record and the parties' own recollections are vital to a proper Gilmore analysis. The development of such a record requires that all strikes by the State and defendant be documented in sufficient detail to facilitate appellate review; it is the trial court's burden to see that this is done.

Here, however, no facts were at issue that could have been resolved by a timely resolution of defendant's Gilmore challenge. Moreover, the prosecutor's race-neutral reasons for striking the jurors were found by the court to be credible and were supported by the record. In light of the remand record, and pursuant to our deferential standard of review, we conclude that the court conducted an adequate Gilmore third-step analysis, and its findings were not erroneous. Therefore, reversal and remand for a new trial was not appropriate.

30

IV.

For the reasons set forth above, the judgment of the Appellate Division is reversed, and the matter is remanded for the Appellate Division to consider defendant's sentencing claim.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGE CUFF (temporarily assigned) join in JUSTICE SOLOMON's opinion.  JUSTICE FERNANDEZ-VINA did not participate.

SUPREME COURT OF NEW JERSEY

NO. ___A-47___ SEPTEMBER TERM 2014

ON CERTIFICATION TO_____ Appellate Division, Superior Court___

STATE OF NEW JERSEY,

      Plaintiff-Appellant,

          v.

SALADIN THOMPSON,

      Defendant-Respondent.

DECIDED_____ March 8, 2016 _____
_____ Chief Justice Rabner _____ PRESIDING
OPINION BY _____ Justice Solomon _____
CONCURRING/DISSENTING OPINIONS BY_____
DISSENTING OPINION BY _____

| CHECKLIST | REVERSE/ REINSTATE/ REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | -------------------- | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 6 | |