**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2312-17T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

LEONARD K. JOHNSON, a/k/a
LEONARD K. FLAGG, KEITH
L. FLAGG, KEITH JOHNSON,
LEONARD JOHNSON, and
MARCUS W. FLAGG,

    Defendant-Appellant.

_____

Argued September 19, 2019 – Decided January 13, 2020

Before Judges Alvarez, Suter, and DeAlmeida.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 15-09-0825.

John Walter Douard, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; John Walter Douard, of counsel and on the briefs).

Andre R. Araujo, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Andre R. Araujo, of counsel and on the brief).

PER CURIAM

Tried to a jury, defendant Leonard K. Johnson was convicted of the first-degree armed robbery, N.J.S.A. 2C:15-1, of a bank in Vineland. The jury acquitted defendant of second-degree attempted robbery at a separate bank location. N.J.S.A. 2C:15-1 and 2C:5-1.[1] On November 9, 2017, the trial judge sentenced defendant to fifteen years subject to the No Early Release Act's eighty-five percent parole ineligibility. N.J.S.A. 2C:43-7.2. Defendant now appeals, and we affirm.

Before the trial began, the judge conducted a Miranda[2] hearing during which he listened to defendant's recorded interview with police and a Federal Bureau of Investigations (FBI) agent. Early in the three-to-four-hour interview, defendant admitted that on the relevant date and time he rode his mountain bike to a bank in Vineland. He gave the teller a note demanding money from the cash register, showed her a gun, and she passed him $1000 from her register drawer.

---

[1] Pre-trial, the State dismissed a second count of first-degree armed robbery and second-degree attempt to commit armed robbery.

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

At trial, the teller testified that the incident occurred on April 24, 2013, at approximately 9:20 a.m. The perpetrator, whom she was not able to identify, was wearing a knitted hat, black sunglasses, and a "bubble-type" jacket. The note instructed she hand over unmarked cash and informed her he had a gun. The teller looked up, the perpetrator lifted his jacket, and she saw the handle of a black gun protruding from his waistband. She gave him the money from her drawer, defendant walked out of the bank, and rode away on his bicycle.

The bank surveillance footage as well as the redacted portions of defendant's videotaped statement were played to the jury. Defendant's identity was discovered when police connected him to a green minivan in his girlfriend's name, which had been captured on various surveillance cameras.

In his statement, after admitting his involvement in the Vineland bank robbery, and that he had ridden his bike to Millville intending to rob a bank there, defendant denied involvement in several other bank robberies about which his interrogators posed a host of questions. His admission came almost immediately after an FBI agent joined the session. Defendant thereafter denied any involvement in any other crimes, and denied that anyone had assisted him, whether friend or family member. The note defendant handed the teller was written on the back of defendant's son's paystub.

The judge found the statement admissible despite defendant's argument that he tried to stop the questioning and exercise the right to remain silent. The judge observed that the argument was colorable when the statement transcript was read, but that watching the video made clear that the language defendant was relying upon was not an attempt to stop the interview.

The relevant portion of the statement took place before the arrival of the FBI agent. Defendant engaged in the following colloquy with a Vineland police detective:

> [Detective]: All right. So can I ask you this, and I want you to be honest with me. Are you willing, if I ask you a question today, something as simple as your date of birth to something involving the investigation, are you willing to be honest with me today?
>
> Or -- I'd almost have -- like, I would definitely have more respect for you if you say, I'm not going to answer you truthfully. You know what I mean? Like, some people would just rather lie.
>
> [Defendant]: I'm not lying. I'm just (inaudible) anything.
>
> [Detective]: No, no, no. I'm asking you --
>
> [Defendant]: I don't have anything to say about it. I don't -- whatever it is. I'm saying, if we've got to go to court, that what (inaudible).

[Detective]: No, I understand but what I'm saying, if you say -- you know, I'm asking you, are you willing to be truthful today if I ask you a question? If I ask you a question?

[Defendant]: You asked me a question and I answered and I don't -- I'm like, I (inaudible) to say. I'm like, you ask a question. I don't have anything to say. You all want to ask a question, I'll answer the question.

[Detective]: Okay. No, well, I'm asking you, when I do ask it, if that's going to be a truthful answer; okay? So I mean, you're truthful when you're answering a question?

[Defendant]: Um-hum.

After the exchange, defendant continued to speak to the officers at some length.

On occasion, he fell silent and became emotional.

The judge explained his findings as follows:

That if you look at that sheet of paper and you read it, it sounds like he's saying something that might be able to be construed as an invocation of his Fifth Amendment rights.

I'm going to deal with each of these separately and I'm going to start with the quote on page 13. And I went back and -- during my lunch break and I re-reviewed the tape because, quite honestly, when the tape was first played to me, I didn't pick up on any of this.

I had a transcript in front of me and it went by, and it wasn't until cross-examination by defense

5

counsel, after the tape had been completely played, that I started to understand the position with regard to the defense's assertion.

What bothered me was, is that I said to myself, well, how could I have missed that when I was listening to the tape? Because when you read the words on the page, it sounds like what defense counsel is [talking] about has credence.

Then I went back and I looked at the tape, and the printed word is a wonderful thing but it lacks temporal relevance and that is where the actual recording explains more than the simple translation or the printed transcript.

The judge described the officers' psychological ploy as treating defendant as a "stand up guy" who would acknowledge responsibility and tell them the truth. During the interrogation, defendant asserted his honesty, claimed he was ignorant of the details about what he was being told, and invited the officers to present their evidence and take him to court. The judge concluded that the language quoted above was not an invocation of defendant's Fifth Amendment right because it was made:

in response to a lengthy colloquy being presented to him about, don't deny it because we think if you deny it you're lying, and he says, I'm not lying.

And then he's asserting his innocence by saying, I don't know anything about this, and his reference to going to court has to go -- do with, we'll just go to court and they can present, you know, what you think I am.

6

It is not a disengagement from the questioning. So with regard to that initial statement, I do not find that as even an ambiguous invocation of his right to remain silent because it must be taken in the context of this lengthy statement by both of the officers doing that.

The judge said the issue the detective and defendant were discussing was whether defendant was willing to be truthful, not whether defendant wanted to stop questioning. The judge summarized the effect of watching the video in his interpretation of the words:

That clarified the entire picture. This is not an invocation and even if it was an . . . ambiguous invocation, the reaction by Mr. Johnson himself clarified it that he was not declining to answer questions. He was simply wanting them to stop inferring that he's lying if he denies it.

So to the extent that he made a knowing and voluntary waiver, he made no clear invocation of his right and clarified that he was willing to talk after he made an ambiguous invocation or ambiguous statement related to his right to not answer questions further, and that is borne out throughout the remainder of the transcript.

At trial, defendant denied committing the offenses, and denied having voluntarily waived his right to remain silent. He testified that he did not want to speak with the authorities, but only did so because he was emotionally exhausted. Defendant claimed he told the detectives that he did not "really want

7

to talk to them" but that they ignored him and continued. He added that he continued talking to them only because they threatened to involve his family.

The judge also conducted a <u>Batson</u>/<u>Gilmore</u>[3] hearing during jury selection. Defendant alleged that the State's exercise of three out of four peremptory challenges of African-American jurors, given that defendant was African-American, was unconstitutional. The jury panel was comprised of less than fifty percent African-American potential jurors, while seventy-five percent of the State's peremptory challenges were of African-Americans. The judge concluded "the mere statistical imbalance . . . with regard to the percentage of African-Americans challenged by the Prosecutor . . . establish[es] a prima facie showing in order to move to the second step of the analysis . . . ."

The peremptory challenges made by the prosecutor were as follows:

> 1) Juror K.H., an African-American, was challenged because "her son had been in a similar situation as this defendant, was charged and convicted of an armed robbery. And . . . it did remind her of her son" so the prosecutor feared that it was "too close to home" because of the nature of the offense.

> 2) Juror P.H., an African-American, was challenged because he failed to follow instructions while answering the jury screening questions. The prosecutor was also concerned he would not be able to

---

[3] <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986); <u>State v. Gilmore</u>, 103 N.J. 508 (1986).

A-2312-17T2

follow the instructions given at trial either. However, the prosecutor went on to state that her "main concern" was that P.H. "had multiple brothers in and out of prison, one of which [was] charged with the same type of charge here, armed robbery."

3) Juror K.J., an African-American, was challenged because he "has three nephews . . . that have been very involved [with the prosecutor's] office . . . ." The Prosecutor stated the juror could feel animosity towards the State for the prosecution of his nephews.

The prosecutor identified an African-American member of the jury whose daughter was convicted of a dissimilar crime and was left on the jury. After hearing the prosecutor's response, the judge determined that the State's reasons were legitimate and shifted the burden to defendant to show they were pretextual. Defense counsel was unable to demonstrate that a Caucasian juror remaining on the jury had friends and relatives who had prior offenses.

The judge found that despite defendant's prima facie case of discrimination, "the State has successfully demonstrated non-discriminatory reasons for the challenges exercised on each of the three African-American jurors, who were excluded." He determined the reasons were not pretext for a discriminatory exclusion but were "based on a [sic] legitimate jury selection concerns, referencing similar criminal offenses in the history of family members to that of the allegations against the defendant in this case."

9

While testifying before the jury, the FBI agent to whom defendant confessed was cross-examined as follows:

> Q. Right. Okay. But in the questioning, and I'm going to direct your attention to one of the pages here, you said to Mr. Johnson, you know, what did you say in the note and didn't he say I don't know? I don't remember?
>
> A. The inference I got was he couldn't remember.
>
> Q. Okay. So you show him the note and you told us that even after the statement that was taken from Mr. Johnson you still didn't feel closure, you didn't feel comfortable enough. Did you ever instruct Detective Burke or suggest to Detective Burke, hey maybe we should get a handwriting analysis of this statement to make sure it is Mr. Johnson? Did you ever do that?
>
> A. I did not because I didn't feel it was necessary because he admitted that that was his note. And you keep saying I didn't feel comfortable, I didn't feel comfortable about other things. <u>I knew he robbed the bank</u>.
>
> Q. No, my question was you said that you didn't have closure?
>
> A. I didn't have closure for other reasons.
>
> Q. Okay.
>
> A. <u>I knew he robbed the bank</u>.
>
> Q. Okay. So in your position he robbed the bank; right?

A.    Absolutely.

Q.    Okay. So let me ask you this, and I'm going to direct your attention to ---

THE COURT:  Can I see Counsel at sidebar please?

[(Emphasis added).]

Upon hearing the exchange, the judge advised counsel that he was going to give the jury a limiting instruction. He did so:

THE COURT:    Listen,    his    belief    is    not relevant.    That is -- so I'm going to give a limiting instruction.  I'm just letting you know now I'm going to do that.  Okay.  All right.  It's not even up for debate. Okay.

(Sidebar Concluded)

THE COURT:    All    right.    Ladies    and Gentlemen, a couple of minutes ago, Special Agent Furey told us that he believed that Mr. Johnson did it. I'm striking that.  Do you understand?  You are not to consider that statement at all and here's why.

Whether or not the Defendant is guilty of these charges is for you and you alone to determine.  Do you understand that?  Whether he believes that or not is irrelevant.  Okay.  And you're not to consider his opinion or belief as to what the Defendant did or did not do.  That is for you to determine, but you can not use in that consideration, his opinion.  Do you understand?

So to the extent that he indicated to you what his belief was, you can't consider that and you should not -- that should not enter into your deliberations in anyway. Does everybody understand that?

Now, I'm not talking about the rest of his testimony, I'm only talking about specifically those references that he made. Okay. Thank you very much. You may continue.

Prior to sentencing defendant, the judge thoroughly reviewed his prior criminal history and personal circumstances. He found as a result aggravating factors three, six, and nine, and in mitigation factor seven. See N.J.S.A. 2C:44-1. As the judge said, at age fifty-three, defendant had a history of twelve arrests, two twenty-year-old indictable convictions, and two ten-year-old disorderly persons offenses. His arrest history "run[s] through 2006." He opined that in defendant's case, aggravating factor nine, the need to deter, was particularly meaningful because defendant in times of financial stress had turned to crime. The judge said, "if things get bad enough, things get hard enough, one of the options that he would choose or has chosen is to commit an offense like this and it is a first-degree offense." Because of his unusual criminal history, the judge gave the aggravating factors "moderate weight," as he did mitigating factor seven. As he explained, the factors were "in equipoise," and therefore warranted a sentence in the mid-range for a first-degree offense.

A-2312-17T2

On appeal, defendant raises the following points:

POINT I
JOHNSON'S PURPORTED WAIVER OF HIS MIRANDA RIGHTS, AND HIS SUBSEQUENT CUSTODIAL STATEMENTS, WERE NOT KNOWINGLY AND VOLUNTARILY GIVEN, AND THEREFORE SHOULD NOT HAVE BEEN ADMITTED AT TRIAL.

    A.    Miranda Rights Invocation:  The Law.

    B.    Johnson's Invocation of His Rights.

    C.    Limiting Instructions At Trial.

POINT II
THE PROSECUTION'S PEREMPTORY STRIKES OF THREE AFRICAN-AMERICAN JURORS WERE NOT FOR CREDIBLY RACE-NEUTRAL REASONS, THEREBY VIOLATING DEFENDANT'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY.  U.S. Const., Amends. VI, XIV; N.J. Const. (1947), ART. 1, Pars. 5, 9, 10.

POINT III
FBI AGENT FUREY, FOR NO REASONS WHATSOEVER, IMPROPERLY AND REPEATEDLY ASSERTED HIS BELIEF THAT JOHNSON WAS GUILTY, THEREBY VIOLATING JOHNSON'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL.  U.S. Const., Amends. V, XIV; N.J. Const., Art. I, Pars. 1, 9, 10.  (Not raised below).

POINT IV
THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED DEFENDANT OF A FAIR TRIAL AND WARRANTS REVERSAL OF HIS

A-2312-17T2

CONVICTION. <u>U.S. Const.</u>, Amend. VI, XIV; <u>N.J. Const.</u>, Art. 1, Pars. 1, 10. (Not raised below).

POINT V
THE CASE SHOULD BE REMANDED FOR RESENTENCING BECAUSE THE JUDGE IMPOSED A MANIFESTLY EXCESSIVE AND OVERLY PUNITIVE SENTENCE, IN LIGHT OF THE MODERATE WEIGHT GIVEN TO AGGRAVATING FACTOR (3), THE IMPROPRIETY OF APPLYING AGGRAVATING FACTOR (6), THE FAILURE TO WEIGH HEAVILY ENOUGH MITIGATING FACTOR (7), AND THE FAILURE TO APPLY OTHER APPROPRIATE MITIGATING FACTORS.

I.

We deferentially review a trial court's factual findings regarding a defendant's waiver of his right to remain silent. <u>See</u> <u>State v. Tillery</u>, 238 N.J. 293, 314 (2019). The Court recently reiterated that those findings should be disturbed only if "so clearly mistaken that the interests of justice demand intervention and correction." <u>Ibid.</u> (quoting <u>State v. A.M.</u>, 237 N.J. 384, 395 (2019)) (internal quotation marks omitted). Legal conclusions, however, are reviewed de novo. <u>Ibid.</u>

During custodial interrogation, a suspect must be advised of the following panoply of rights: the right to remain silent, that statements may be used against him, the right to counsel, the right to counsel even if he cannot afford one, the

right to counsel during questioning, and the right to assert his privilege to remain silent at any point during the interrogation. Id. at 315. In New Jersey, we require the State to "prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances." State v. Presha, 163 N.J. 304, 313 (2000). Such waivers may be found even when not explicitly stated. See Tillery, 238 N.J. at 316. In order to determine questions of waiver, a trial court considers the totality of the circumstances surrounding the custodial interrogation. Ibid.

According the trial judge appropriate deference, defendant's statements were not an assertion of his right to remain silent. His responses were occasionally confused and confusing, but at no point did he say the interrogation was over. At times he simply did not answer questions, at others denied involvement, and vigorously, unequivocally denied the involvement of his family after he made his inculpatory statements. Thus, defendant's first point lacks merit.

We agree with the judge that as mixed as some of defendant's answers were, in the context of the specific portion of the interview he identifies as his statement that he no longer wanted to answer questions, defendant was not asserting his right to be silent. He was merely reiterating that he had no

15

information to provide. Otherwise, he said he would answer questions when he had information he could give. Defendant's point was not that he was exercising his right to remain silent, but that he knew nothing about the robberies.

It is noteworthy that defendant, after he confessed to the Vineland bank robbery, and the attempt to rob the Millville bank, forcefully insisted that no one else was involved in the crimes, and that he did not commit any other bank robberies about which he was being asked. Even when confronted with the fact his minivan had been captured on surveillance cameras at other bank locations where robberies had occurred, he adamantly denied them. Defendant's demeanor on the video demonstrated that just as he had the capacity to deny culpability for other offenses after confessing to two crimes, and just as he had the ability to deny that anyone else was involved, he had the ability to assert his right to remain silent and did not do so. He was not intimidated by the officers and was not going to answer questions unless and until he was quite ready to do so. In fact, defendant acknowledged guilt only when confronted with very detailed information.

Defendant's trial testimony that he only confessed because he felt pressured by the officers, and to protect his family, was not convincing. It was refuted by the narrative captured on video.

Defendant's contention on appeal that his references to court proceedings were an invocation of his right to counsel lacks merit. Initially, defendant told the officers that he was prepared to go to court because he knew nothing about the crime. That is a far cry from any mention of the right to counsel. This argument lacks merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2).

## II.

Turning to defendant's next point, in Batson v. Kentucky, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race . . . ." 476 U.S. at 89. A defendant asserting the State wrongfully exercised peremptory challenges under Batson must first "make a prima facie showing that a peremptory challenge has been exercised on the basis of race . . . ." Snyder v. Louisiana, 552 U.S. 472, 476 (2008) (citations and quotation marks omitted). Once this burden has been met, the prosecutor "must offer a race-neutral basis for striking the juror in question . . . ." Id. at 477. "Thereafter, the trial court is tasked with determining whether the defendant has established intentional discrimination, 'in light of the parties' submissions." State v. Thompson, 224 N.J. 324, 339 (2016) (quoting Snyder, 552 U.S. at 476).

A-2312-17T2

"It is not until the third step that the persuasiveness of the justification becomes relevant -- the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." Ibid. (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995)).

The Court in State v. Gilmore, 103 N.J. 508 (1986), "determined that the provisions of the New Jersey Constitution, Article I, Paragraphs five, nine, and ten, likewise prohibited a prosecutor from exercising peremptory challenges on the basis of religious principles, race, color, ancestry, national origin, or sex." Thompson, 224 N.J. at 340 (citing Gilmore, 103 N.J. at 524-29). The Court then outlined a similar three-step analysis for trial courts to follow when adjudicating a claim of unconstitutional discrimination in the use of peremptory challenges. Gilmore, 103 N.J. at 533-39.

"That analysis begins with the 'rebuttable presumption that the prosecution has exercised its peremptory challenges on' constitutionally permissible grounds." Thompson, 224 N.J. at 340 (quoting id. at 535). Defendant must make a "prima facie showing that the prosecution exercised its peremptory challenges on constitutionally-impermissible grounds." Gilmore, 103 N.J. at 535. In order to establish a prima facie claim, Gilmore required a defendant to show "that the potential jurors wholly or disproportionately

excluded were members of a cognizable group," and that "there is a substantial likelihood that the peremptory challenges resulting in the exclusion were based on assumptions about group bias rather than any indication of situation-specific bias." Id. at 535-36.

We defer to the trial court's findings as to a prosecutor's exercise of peremptory challenges. State v. Clark, 316 N.J. Super. 462, 473 (App. Div. 1998). In this case, the statistical data satisfied defendant's initial burden of proof—but the reasons stated by the prosecutor were proper. Id. at 473-74.

The three excused jurors who were African-American all had family members who had either been charged with armed robbery or been prosecuted by that county's prosecutor's office. Those factors establish non-discriminatory reasons for dismissal. Additionally, the prosecutor did not excuse an African-American juror who also had a family member convicted of a crime because the crime was dissimilar.

Defendant's argument on appeal that there are inherent racial biases built into the criminal justice system which make the exercise of peremptory challenges itself biased does not, on this record, warrant discussion in a written opinion. See R. 2:11-3(e)(2).

A-2312-17T2

III.

Addressing defendant's next claim of error, it is undisputed that the FBI agent's testimony that he "knew" defendant robbed the bank was improper. But it bears mention that at that juncture the jury had already watched the redacted video of defendant's inculpatory statements.

The judge immediately called counsel to sidebar after the FBI agent made the comment and immediately explained to the jury that the agent's beliefs were "irrelevant," instructing that they were not to take them into account when deliberating. The instruction made the necessary point without highlighting the statements more than absolutely necessary. We assume that jurors follow instructions. State v. Herbert, 457 N.J. Super. 490, 504-05 (App. Div. 2019); see also State v. Burns, 192 N.J. 312, 335 (2007) ("One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions.") (citing State v. Nelson, 155 N.J. 487, 526 (1998)).

Thus, we do not consider meritorious defendant's argument on appeal that the judge should have declared a mistrial because of the agent's statements. In the overall context of the trial, and since the jury had seen defendant's videotaped admissions, no mistrial was required.

IV.

Defendant also contends that the cumulative effect of trial errors warrants a new trial. With the exception of the agent's statements, no error occurred. And that mistake was promptly cured by the trial judge with an appropriate instruction, making a mistrial unnecessary. The cumulative error argument lacks sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2); see also State v. Orecchio, 16 N.J. 125 (1954).

V.

Finally, defendant argues that the matter should at a minimum be remanded for resentencing because of the length of the term of years imposed for these offenses. In reviewing excessive sentence claims, we do not substitute our judgment for that of the trial court. State v. Fuentes, 217 N.J. 57, 70 (2014). A sentence will be affirmed unless the Code's sentencing guidelines have been violated, where competent and credible evidence does not support the statutory aggravating and mitigating factors, or the sentence shocks the judicial conscience. Ibid.

In this case, the trial court reviewed defendant's criminal history and personal circumstances thoroughly before finding aggravating or mitigating factors. The record supported his conclusions. The judge's thoughtful

consideration of the factors readily survives appellate review.  The sentence does not shock the judicial conscience.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION